CUTLER–HAMMER, INC.
v.
The UNITED STATES.
No. 364–67.

United States Court of Claims.
Oct. 17, 1969.

David V. Anthony, Washington, D. C., for plaintiff, Gilbert A. Cuneo, Washington, D. C., attorney of record, John M. Allen and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge.

Plaintiff contracted with the United States Air Force to design, develop and manufacture an electronic reconnaissance system to be carried in aircraft. The contract was a Fixed-Price-Incentive-Fee (FPIF) type, with a negotiated target cost of $22,389,523.00. A 10% target fee was added, making the target price $24,628,475.00. Cost savings below the target cost or expenditures above it were to be shared by the Air Force and plaintiff on an 80%–20% basis.

General provision 52 of the contract is entitled "Price Reduction For Defective Cost or Pricing Data," and reads as follows:

(a) If the Contracting Officer determines that any price, including profit or fee, negotiated in connection with this contract was increased by any significant sums because the Contractor, or any subcontractor in connection with a subcontract covered by (c) below, furnished incomplete or inaccurate cost or pricing data or data not current as certified in the Contractor's Certificate of Current Cost or Pricing Data, then such price shall be reduced accordingly and the contract shall be modified in writing to reflect such adjustment.

Because the time allowed for submitting price proposals was short, and because a large number of personnel familiar with the system contracted for could not be spared without impairing progress on the whole program, plaintiff assembled a group of qualified people from various sections of its facility to formulate the proposal.

There are a number of different methods of formulating proposals. One is the "family tree" method, which is a block diagram depicting the approximately 140-line replaceable units (LRUs) which make up a single system. Each block indicates the type of LRU involved and the number per system. Below each block the various kinds of subassemblies are set out, as well as the number of each subassembly in the entire system. The final bill of materials is arrived at by multiplying the type and quantity of each subassembly per system by the number of systems.

The "family tree" method is standard in the industry, but it has several variations. In one variation, the quantities of subassemblies indicate the number per LRU instead of the number per system. Thus, when this method is employed, the number in the subassembly block must first be multiplied by the number of LRUs in the system, and then by the number of systems.

Since some of the members of the group were accustomed to the latter method, they incorrectly multiplied the subassembly number, which represented the number per system, by the number of LRUs, before again multiplying by the number of systems. The number of subassemblies was thereby overstated by about 50%. These duplications led to an overstatement in price, for which the Government is seeking a reduction.

Plaintiff alleges, however, that even if it overstated this particular cost, it is entitled to offset this amount with understatements of the cost of purchased parts and components which resulted from other calculating errors. Thus, one legal issue which faces this court is whether the provision governing defective pricing allows such a set-off.

In addition to the Government's first claim, it is seeking to further reduce the target price by invoking the current cost and pricing data portion of the Defective Pricing Clause as to the antenna equipment. Each of the nine systems contracted for utilized two each of six different types of antenna. Plaintiff chose to use the Luneberg lens, whose availability was restricted in terms of sources of supply. Prior to the contract at issue, the only company that had produced the lens for the applicable purpose was Aero-Geo-Astro (AGA). On December 10, 1963, plaintiff issued a Request for Quotations from five different companies. Only AGA submitted a proposal, in the amount of $406,445.00, and this sum was included in plaintiff's price proposal submitted on January 13, 1964.

During January 1964, Transco Products Co. learned about plaintiff's Request for Quotations, and asked for one. On February 10, 1964, plaintiff received a price proposal from Transco in the amount of $91,260.00, and on February 24 it received Transco's technical proposal.

From January 13 to February 13, 1964, the Government was conducting its audit and price analysis of plaintiff's proposal. From February 13 to February 19, 1964, the parties negotiated a reduction in plaintiff's original proposal in the amount of $1,858,805.00. The respective prices of all major vendors were discussed, including those of AGA, but no mention was made by plaintiff of Transco's lower proposal. Plaintiff contends that Transco's proposal was so low that it could not have been considered a valid proposal, and mention of it would just have confused negotiations. The Government, however, asserts that had Transco's proposal been mentioned, execution of the contract would have been delayed until Transco's competency could be ascertained, or in the alternative, the Luneberg lens costs would have been excluded from the contract negotiations and discussed separately.

Plaintiff is presently seeking Wunderlich Act review (41 U.S.C. §§ 321, 322) of the decision of the Armed Services Board of Contract Appeals (hereinafter referred to as the Board or the ASBCA) in Cutler-Hammer, Inc., ASBCA No. 10900, 67–2 BCA, ¶ 6432, p. 29,822 (decided June 28, 1967). The Board held that the Government was entitled to reduce the price of the contract under the "Price Reduction For Defective Cost or Pricing Data" clause. This case was remanded to the contracting officer so that the parties could negotiate the reduction in price. Instead of entering into the negotiations, plaintiff commenced the instant suit. Both sides are moving for summary judgment.

## I—Duplication Issue

■ The basic question presented in this aspect of the case is whether the Defective Pricing Clause requires consideration only of errors which overstate the price, or whether it allows

consideration of errors which understate the price. In other words, even if there are duplications which raise the price, can the omissions which lowered the price be set off against the overstatements? The Board held that only overstated costs could be considered, stating:

> * * * Although reasonable men may certainly differ on this interpretation, it is our conclusion that the Defective Pricing Statute (PL 87–653, 10 Sept. 1962; 76 Stat. 528) was intended solely as a vehicle for recoupment by the Government of overpricing resulting from any of the causes enumerated therein. * * *

Id. at p. 29,826.

The statute providing for reduction in contract price where there has been defective pricing is found at 10 U.S.C. § 2306(f) (Supp. IV, 1965–1968). It states in pertinent part:

> * * * * * *
>
> Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or non-current: * * *.

■ The bill which was enacted into P. L. 87–653, 10 U.S.C. § 2306(f) was H.R. 5532, and it aimed at "truth in negotiating." [1] In an incentive type contract, costs of production are estimated and a normal profit (a percentage of costs) is added on to arrive at the target price. When "actual" costs prove to be

1. See Hearings before the Senate Committee on Armed Services on H.R. 5532, 87th Cong., 2d Sess. (1962), pp. 15–16.

less than "estimated" costs, the contractor receives not only the "estimated normal profit," but an "incentive profit" as well, which is determined by the cost-sharing formula contracted for (usually 20% of "estimated" costs minus "actual" costs).[2] It was found that in almost all cases, actual costs proved to be less than estimated costs, and it was assumed by Congress that this resulted from inflated cost estimates. The statute was therefore aimed at reducing the contract price when it was found that cost items had been overstated, so that a contractor would share in savings only when these savings resulted from actual efficiencies.

It is clear that when only overstatements are included in estimates, the Government has the right to reduce the contract price. In such a situation, a downward revision of the price is mandated.[3] Whether offsets in favor of the contractor are to be allowed presents a more difficult question, the answer to which is not so readily apparent. The legislative history of the act does indicate that efforts were made to have the language of P.L. 87–653 cover situations where errors in favor of the Government would cancel out errors in favor of contractors, but these efforts were to no avail. For example, William H. Moore, Vice President of the Electronic Industries Association, Military Products Division, objected to the language of H.R. 5532, and the following colloquy ensued:

> Mr. Moore. * * *
>
> * * * the language as it stands provides only a one-way street. It is unfair, I believe, to contractors, because it says nothing about the situation in which hindsight may reveal that there have been mistakes that accrued to the Government's benefit.
>
> Senator Symington. Don't reach out for the last cherry to the point where you break this branch * * * you do not want to make an *excess profit*

even as the result of an honest mistake.

> * * * * * *
>
> Senator Cannon. * * *
>
> Now, Senator Symington has just simply said that you would not want to use, to be in a position of advocating by the use of inaccurate, incomplete and noncurrent data and building up your target price, even though it was inadvertent at the time, that you would then want that measurement to determine how much of an *incentive* you were going to get.
>
> * * * * * *
>
> Senator Symington. * * *
>
> Again, if you make an honest mistake, you should not be rewarded with *additional* profit; and if you cheat as to what is estimated cost, you should pay for it. [Emphasis supplied.] Hearings before the Senate Committee on Armed Services on H.R. 5532, 87th Cong., 2d Sess. (1962), pp. 100–102.

As has already been explained, in an FPIF contract, if a contractor's actual costs are less than estimated costs, then both the contractor and the Government share in the savings. This shared saving constitutes "additional profit" for the contractor. Thus, to the extent that an inflated estimated cost is due to overstatements, the contractor should not derive any gain from artificial savings. There is no clear statement in the legislative history, however, which mandates that there be a downward revision in price in excess of overstatements which are not washed out in the final price by understatements. When Senator Symington stated that "what we are talking about has to do with negotiations downward, not negotiations upward," *Id.* at 102, he may merely have been saying that it was not the intent of Congress to allow understatements greater than overstatements to both cancel out the latter and increase the contract price at the same time.

---

2. H.Rep.No. 1638, 87th Cong., 2d Sess. (1962), pp. 5–6.

3. S.Rep.No. 1884, 87th Cong., 2d Sess. (1962), p. 4.

Plaintiff contends that the literal language of the statute allows set-offs; defendant argues that the language of the statute and the legislative history dictate against allowing understatements to be set off against overstatements. In our view, neither the statute nor the legislative history is clear-cut. In the absence of concise guidelines, we must resort to finding the legislative intent. As Lord Justice Denning stated:

* * * Whenever a statute comes up for consideration it must be remembered that it is not within human powers to foresee the manifold sets of facts which may arise, and, even if it were, it is not possible to provide for them in terms free from all ambiguity. The English language is not an instrument of mathematical precision. Our literature would be much the poorer if it were. This is where the draftsmen of Acts of Parliament have often been unfairly criticized. A judge believing himself to be fettered by the supposed rule that he must look to the language and nothing else, laments that the draftsmen have not provided for this or that, or have been guilty of some or other ambiguity. It would certainly save the judges trouble if Acts of Parliament were drafted with divine prescience and perfect clarity. In the absence of it, when a defect appears a judge cannot simply fold his hands and blame the draftsman. He must set to work on the constructive task of finding the intention of Parliament, and he must do this not only from the language of the statute, but also from a consideration of the social conditions which gave rise to it, and of the mischief which it was passed to remedy, and then he must supplement the written word so as to give "force and life" to the intention of the legislature. * * * Put into homely metaphor it is this: A judge should ask himself the question: If the makers of the Act had themselves come across this ruck in the texture of it, how would they have straightened it out? He must then do as they would have done. A judge must not alter the material of which it is woven, but he can and should iron out the creases. Seaford Court Estates Ld. v. Asher, [1949] 2 K.B. 481, 498–499.

Public Law 87–653 was intended to apply to situations where the data supplied was incomplete, inaccurate, or noncurrent. It was aimed at cases where costs were known, but information about them was withheld. The statute (and the contract clause which is utilized pursuant to the statute) speaks in terms of "*Defective* Pricing." If a cost is known when the contract price is being negotiated, it must be furnished accurately, completely, and on a current-price basis. If the contractor purchases components from a subcontractor, these costs are also subject to the Defective Pricing Clause.

Congress realized the potential value of incentive contracts; but, in the words of Congressman Vinson, the provision was intended to " * * * put the incentive profit where it belongs; that is, on demonstrated performance of the work and not by deception in negotiations."[4] It would behoove the contractor to be as efficient as possible in order to reduce his production expenses— he may thus try to change his assembly-line set-up so as to speed up production and thereby cut down on overhead. In this fashion, he would lower costs, and share in this profit through "demonstrated performance of the work."

A much different situation obtains where inaccurate cost data for components is supplied, however. When a cost for a component is furnished, and in fact, the component costs less, then the saving was merely due to the inaccurate data, and not to any efforts on the part of the contractor to save money. Were it not for P.L. 87–653, there would be no incentive to pare down costs, but rather to inflate cost estimates.

4. Hearings before the Senate Committee on Armed Services on H.R. 5532, 87th Cong., 2d Sess. (1962), p. 16.

With the foregoing in mind, there would seem to be no reason not to allow offsets. An overstatement would clearly have the effect of creating "unearned" savings. An understatement would cut down on these savings. When offset against each other, at least *to the extent* of the overstatements, the only savings that can be produced are those brought about through "demonstrated performance of the work."

■ It is argued that since the statute talks in terms of "reducing" the contract price, and the contract clause speaks in terms of "excluding" defective prices, there can only be a *downward* revision of price. With this we agree, but we interpret those words to mean that where overstatements exceed understatements, the excess reduces the price; conversely, where understatements exceed overstatements, the price *is not* raised. To this extent, at least, the Defective Pricing statute does act as a "spur" to the contractor to make sure his estimates are complete, accurate and current, and does provide for a "one-way street."

We are mindful of the fact that Congressman Hébert introduced a bill in the 88th Congress which would have explicitly allowed offsets.[5] Had this bill been voted on and defeated, it would be a clear indication that Congress did not intend to allow such offsets. However, the bill was never brought to a vote, and it is quite difficult to derive any Congressional intent from a lack of action, especially when the reasons for not voting on a proposed bill are multitudinous. As the standard work on statutory construction states:

\* \* \* Generally the rejection of an amendment indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment. *However, such rejection may occur because the bill in substance already includes those provisions.* Emphasis supplied.] 2 Suth-

erland, Statutory Construction, § 5015, p. 506. (Horack 3rd ed. 1943.)

Here, of course, there was never even any rejection of the Hébert bill, but merely inaction on it.

■ Finally, defendant argues that allowing offsets would permit "buying-in" on Government contracts. This practice is defined as follows:

\* \* \* attempting to obtain a contract award by knowingly offering a price or cost estimate less than anticipated costs with the expectation of either (1) increasing the contract price or estimated cost during the period of performance through change orders or other means, or (2) receiving future "follow-on" contracts at prices high enough to recover any losses on the original "buy-in" contract. \* \* \* 32 CFR § 1.311 (January 1969 rev.) ASPR 1–311.

It is clear from the foregoing definition why a prohibition against an *upward* adjustment of contract price would work against "buying-in." If a contractor could knowingly understate certain costs in order to lower his price and obtain the contract, and thereafter show the true costs of the items and get an upward adjustment, this would work an injustice against the Government and the other bidders. In our case, however, there were both overstatements and understatements, and to the extent that the dollar amount of overstatements matched the dollar amount of understatements, the contract price was not reduced to effect "buying-in." Since, in our opinion, offsets should be allowed to the extent of overstatements only, and no more, the contractor cannot lower his costs and thereafter attempt to recoup any of his understatements in excess of overstatements. By virtue of this limitation, there is nothing to be gained by a contractor underestimating his costs, since he can never get an upward revision in price later on.

As far as "buying-in" at a loss to get a profitable follow-up contract later on,

---

5. H.R. 7999, 88th Cong., 1st Sess. (1963).

this evil would be present whether there were underestimates only, or whether there were both underestimates and overestimates. In fact, if a contractor overestimates as well as underestimates, he hinders any possible efforts he may be making to "buy-in."

■ There is some controversy between the parties regarding the amount of the understatement. The Board found the overstatement to be $504,483.00, and that the net overstatement was $18,155.00. Plaintiff contends that a correct calculation of the duplications and omissions would yield a net *understatement* of $13,824.00. Defendant agrees that the Board's determination of a net overstatement is incorrect, but argues that the net understatement was only $8,396.00. In light of our determination that overstatements are offset by understatements only *to the extent* of the overstatements, we need not concern ourselves with the net amount of understatements. Since understatements exceed overstatements (by admission of both parties) there is no reason to revise the estimated cost of the contract downward; moreover, since there can never be an upward revision of cost (and certainly not under the facts of this case) the estimated cost and target cost of the contract remain unchanged.

## II—The Luneberg Lens

■ The Board held as to this claim that the Government was entitled to reduce the contract price because of the failure of Cutler-Hammer, Inc. to disclose Transco's lower bid on the antenna. In reviewing this holding, we are faced with two questions: (1) Was Transco's bid "cost and pricing data" within the meaning of the statute and the contract clause implementing it? (2) Would the disclosure of the Transco bid have affected the negotiations between the parties? The answers to both these questions are in the affirmative, and we therefore uphold this part of the Board's determination.

The statute requires the furnishing of a certificate by the contractor, in which he attests to the fact that (1) complete cost and pricing data, current as of the date of the original proposal, have been submitted; (2) all significant changes in the above data which have occurred since the aforementioned date through the date of agreement on the negotiated price or fee have been similarly submitted, and no more recent significant change in such data was known to the contractor at the time of executing the certificate; and (3) all the data submitted are correct.

In our case, AGA's quote did not change from January 13, 1964 (the date plaintiff submitted its proposal), to February 19, 1964, when the contract price was agreed upon; indeed, it did not change even after the execution of the certificate on February 26, 1964. However, lurking in the background was Transco's quotation.

It is true, as plaintiff submits, that Transco's quotation was much lower than AGA's. Therefore, plaintiff argues, the proposal could not be taken seriously, and hence it was not "cost and pricing data." This argument, although somewhat persuasive standing alone, is unpersuasive when viewed in the light of what was transpiring between the parties.

Plaintiff did not receive Transco's price proposal until February 10, 1964. Although an audit and price analysis was at that very time being conducted by the Government of plaintiff's proposal, which included AGA's quotation, plaintiff was nonetheless interested enough in Transco as a possible subcontractor to ask Transco on the very next day for a technical proposal. This technical proposal was received on February 24, 1964, two days before the certificate was furnished.

When a contractor issues a Request for Quotations, he is not required to divulge to the Government every proposal he receives. All the Government desires to know is the cost of each component which will be included in the final product. These costs together make up the estimated cost, and actual costs are thereafter matched against the estimated costs

in order to arrive at any savings or losses.

If the AGA proposal included in plaintiff's proposal had been inflated, there is no doubt that the Government would be entitled to a downward revision of price. Similarly, if AGA had learned, after January 13, but before negotiations were completed and the certificate filed, that it could possibly produce the antenna by a new and cheaper method, and had informed Cutler-Hammer of this fact, it would appear that this would be "current cost and pricing data" which plaintiff would have been required to divulge.

From the facts in this case, Transco was not just another bidder on a component, whose bid had been considered by plaintiff and disregarded. Plaintiff was interested enough in Transco's bid, even at a late date, to follow it up with a request for a technical proposal. Since Cutler-Hammer saw Transco as a possible supplier, it should have informed the Government that a lower price on the antenna may have been obtainable.

Although no firm agreement had been reached with Transco until after the certificate was filed, the fact that its proposal was being considered during this time indicates that the cost and pricing data submitted by plaintiff were less than complete or current. To allow a contractor to submit data, arrive at a negotiated price, file a certificate, and then use a lower component cost, when that lower cost was a definite possibility during the negotiating stage, but was not then disclosed, would defeat the purpose of the statute and the contract clause.

■ Our decision as to this facet of the case should not be construed as indicating that Cutler-Hammer had planned to include the higher AGA quotation in its proposal only until the certificate was filed, and then intended to use Transco because of the latter's lower bid. All we are saying is that when a contractor goes beyond merely receiving a quotation, and considers using a lower bidder, that possibility should be reported to the Government. Otherwise, the "cost and pricing data" are not current or complete.

A review of the contractual arrangements in an FPIF contract indicates the necessity for such circumspect action by a contractor. In an FPIF contract, the contractor is reimbursed for his costs, and gets a profit or fee based on those costs. Moreover, savings based on the same costs are shared by the Government and the contractor. Thus, all fees and profits are directly related in some fashion to costs; any inaccuracy in the latter will affect the former. If a quotation which is incomplete or noncurrent is included in a proposal, and this cost is higher than the complete or current cost, the fee is increased, and the possibility for "unearned savings" arises. And, as has already been indicated, P.L. 87–653 was directly aimed at wiping out these "unearned savings."

There may, of course, be situations where only one cost is considered by the contractor, and after negotiations are completed and the certificate is filed, a lower cost is obtainable. The language of the statute and the contract clause seems to say that no downward revision is mandated, since costs were accurate, complete and current *as of* the filing of the certificate. Such a situation is not the one facing us here, however; Transco's lower cost was well within the contemplation of the contractor. In our view, P.L. 87–653 could lose much of its effectiveness if contractors could argue that they did not disclose a quotation because they did not consider it "cost or pricing data", although they later took advantage of it to the detriment of the Government.

■ Plaintiff attempts to escape from the fact that it was actively considering Transco's quotation by defining "cost and pricing data" as data upon which a reasonable businessman would rely in negotiating a contract. This definition begs the questions; "cost and pricing data" is made up of costs which *may* or will make up part of the total cost of a con-

tract, and which should therefore be divulged in negotiating a contract.

The fact that Transco's quotation was "cost and pricing data" does not mean that it was so only because of hindsight, as plaintiff argues. We are not deciding whether a lower cost unbeknownst to the contractor when he files the certificate would lead to a downward revision in price if it is used instead. Here, the scenario, as it developed, demonstrated that Transco's quotation was being considered by Cutler-Hammer—it should therefore have been divulged to the Government for the latter's consideration.

Our interpretation of what constitutes "cost and pricing data" is reinforced by an ASPR definition which was not in effect at the time of this contract. Both sides contend that this definition supports their arguments; we read it as buttressing the Government's case. The regulation reads in pertinent part:

"Cost or pricing data" as used in this subpart refers to that portion of the contractor's submission which is factual. The requirement for "cost or pricing data" subject to certification is satisfied when *all facts reasonably available to the contractor* up to the time of agreement on price and *which might reasonably be expected to affect the price negotiations* are accurately disclosed to the contracting officer or his representative. * * * In short, cost or pricing data consist of all facts which can reasonably be expected to contribute to sound estimates of future costs as well as to the validity of costs already incurred. * * * [Emphasis supplied] 32 CFR 3.807–3(e) (1969 rev.), ASPR 3–807.3(e).

The facts as to Transco's quotation were available to the contractor. Moreover, as the Board found, and as we affirm, this quotation "would reasonably be expected to affect price negotiations."

Since the finding of the Board as to the effect of Transco's quotation on price negotiations is not arbitrary, capricious, and is supported by substantial evidence,

it too is entitled to finality. The difference between the AGA quotation and the Transco quotation was not a *de minimis* amount; rather, it was substantial. Furthermore, the Government negotiator, Mr. Herron, testified that had he known of the Transco quote, he could have recommended two possible courses of action: (1) delaying final negotiations pending an investigation of the technical and price impact of the Transco quote, or (2) deleting the proposed cost for Luneberg lenses and negotiating the Luneberg lens contract at a later date.

These were possible courses of action, and based upon the obvious need for work to proceed rapidly on the project (as evidenced by plaintiff having to prepare a proposal within a short period of time) it was reasonable for the board, based on Mr. Herron's testimony, to conclude that the Luneberg lens negotiations would have been conducted separately.

Plaintiff makes much of the language used by Mr. Herron, that he said "could have" instead of "would have" suggested the two alternatives, and that therefore there is no guarantee that the Government would have done either. Such subtle nuances of language when used under fire of questioning is too slim a reed upon which to support an argument, and we therefore reject it.

Finally, plaintiff argues that Mr. Herron later commented, in response to a hypothetical question posed by a Board member, that he would have chosen alternative (1), whereas the Board found that the Government would have pursued alternative (2). From this, plaintiff concludes that the Board had no evidence upon which to base its finding. We disagree, not only because Mr. Herron's testimony as to what he would have done is irrelevant, since he was not the Contracting Officer at the time the decision had to be made, but also because plaintiff's own attorney *attacked* Mr. Herron's ability to answer this question in the abstract, without "hindsight," while he is now seeking to use the very same statement to *support* his argument. The

Board, however, was not using hindsight, but only decided what the Government, with the pressures which existed at that time, might reasonably have done.

Having decided that the Luneberg lens part of the contract would have been deleted for separate negotiations, the Board deducted the AGA quotation from the contract price.[6] The Transco quotation would then be added to arrive at a new contract price. However, the Board felt that due to Transco's unreliability, a contingency factor could have been added to the quotation by Cutler-Hammer, and remanded the issue to the Contracting Officer so that the parties could negotiate the Luneberg lens cost. Plaintiff appealed the Board decision before negotiations could take place, however.

Defendant now argues that the Board had no evidence upon which to conclude that Cutler-Hammer would be entitled to add a contingency factor. We find this bare assertion unpersuasive in light of the Board's statement that plaintiff had to supply substantial and unusual technical assistance to Transco in helping the latter in developing the Luneberg lens, and the fact that prior to this contract only AGA had produced the lens for the applicable purpose.

### III—Conclusion

In accordance with our opinion, the contract price in this case is not to be reduced, since overstatements do not exceed understatements, and are offset to the extent of the understatements. Moreover, proceedings on the amount to be added to the target cost for the Transco quotation are suspended, pending negotiations between the Contracting Officer and the contractor.

For the foregoing reasons, plaintiff's motion for summary judgment on the "Duplication" issue is granted, thereby reversing the Board, and plaintiff's motion for summary judgment on the "Luneberg lens" issue is denied, thereby affirming the Board. Defendant's cross-motion for summary judgment is therefore denied as to the "Duplication" issue, and granted as to the "Luneberg lens" issue. Judgment is therefore entered for plaintiff on the "Duplication" issue, with proceedings suspended pursuant to Rule 167 for a period of 90 days. The petition is dismissed as to the "Luneberg lens" issue.

DAVIS, Judge (dissenting in part and concurring in part):

For the "duplication" issue (Part I of the court's opinion), none of the keys fits at all well, and the lock must be forced, one way or the other. Both sides urge that the language of the Truth-in-Negotiations Act is clear on its face, but the only thing plain to me is that equally respectable textual arguments can be made for both the contractor's and the Government's positions. The legislative history[1] is also inconclusive; the only part bearing directly on offsets seems to favor the Government but that dialogue can also be read as dealing with the different problem of whether upward price revisions should be allowed for errors the contractor makes against himself. The purpose of the statute is likewise unclear—is it simply to prevent windfall profits to the contractor or is it also to encourage or push contractors into being more careful in making their cost estimates? And where, as in this case, the result of either interpretation affects no more than the size of the contractor's profit—a loss is not involved —I see no objective principle of fairness strongly favoring one side or the other. These and the other aids to interpretation,[2] singly or in combination, do not

---

6. The Board deducted $422,805.00, which represents a number of adjustments to AGA's original quotation.

1. See Roback, Truth in Negotiating: The Legislative Background of P.L. 87–653,

1 Public Contract Law J., No. 2, p. 3 (1968).

2. The canon *contra proferentam* is of no help because the contract clause parrots the statute, and I know of no accepted rule that Congress' procurement legisla-

readily turn the bolt. Still, it remains our judicial duty to open the door, no matter how resistant.

Driven by this compulsion to decide, I would force the lock, in this instance, in the Government's favor. My basis for this choice is twofold. First, the only parts of the legislative history dealing specifically with offsets tend to support the Government's interpretation, and I would, in the absence of anything else, accept that flickering light as the best we have. At the Senate hearings, a representative of the electronics industry criticized the bill as a "one-way street", suggested that "there ought to be some offset", and offered to submit language embodying that proposal. Senators Symington and Cannon seemed to reject this approach outright. Hearings before the Senate Committee on Armed Services on H.R. 5532, 87th Cong., 2d Sess. (1962), pp. 100–102; Roback, *supra*, p. 23. Thereafter, the Electronics Industry Association did submit a substitute which explicitly authorized offset (Hearings, *supra*, p. 103), but this suggestion was not adopted. Plaintiff's brief concedes that "Viewed cold, it may be argued that the testimony [to which I have just referred] lends superficial support to this [the Government's] view", but then makes a strenuous argument that the Senators misunderstood the proposal and did not realize that only offset

was involved, not an attempt to increase the contract price in the contractor's favor. This may or may not be so—the Senators' remarks are not explicit or pointed—but the fact remains that, although contractors expressly put forward offset, both orally and in writing, the Senate Committee (which really framed the bill in its final form, see Roback, *supra*, at pp. 20–24) gave no hint of accepting it, and rejected a written proposal incorporating offset.[3] Admittedly, the legislative record is unsatisfactory on the point, but, in the absence of any other meaningful sign, I would accept what appears on the surface—rejecting offset—as manifesting the Congressional intention.

My secondary reason is that, although even the sharp-eyed can see all of this Act's purposes only through a glass darkly, I do discern an aim to spur contractors into more careful and correct pricing. Certainly, the chief goal of the statute was to prevent windfall profits occurring through mistaken estimates, but there are also indications that Congress was interested in pushing bidders and contractors into more carefully prepared, more accurate, proposals all along the line. Senator Symington stressed "efficiency and intelligence," rather than "integrity", as the basis of the bill; he also spoke at the hearing against "buying in" practices. Roback, *supra*, pp. 22–23.

tion should be read in favor of the contractor and against the Government (or vice versa). The administrative construction of the Act is so recent, and so enmeshed in controversy from the start, that no real deference can be given to the views of the Comptroller General and the Defense Department. The unsuccessful attempt to amend the Act is, as the court points out, quite equivocal. Nor do I get significant assistance from invoking the burden of persuasion. That principle is not normally applied to issues of statutory interpretation, and in any event. I would not know whether the burden should be on the contractor as plaintiff seeking to overturn the ASBCA decision, or on the defendant seeking to prevent payment by use of the defense that the Act has been triggered into operation.

3. It is possible, of course, that this written proposal, which purported to cover the entire subject of the bill, was rejected as a whole for other reasons (see Roback, *supra*, p. 23), but it is at least certain that the proposed offset language was not put into the final Committee bill.

I do not at all agree with plaintiff's contention that to reject offset would be inconsistent with the position advanced by other legislators during the course of the consideration of the bill. The difficulty with the legislative history, as I see it, is that most of it is consistent with both the plaintiff's and the defendant's position, but I find nothing in favor of the concept of offset while there are the indications I have mentioned opposed.

The Senate Committee report said that "those costs that can be shown *should* be furnished currently, *accurately,* and completely", and then added so far "as is practicable". S.Rep.No.1884, 87th Cong., 2d Sess., p. 4 (emphasis added). To reject offsets, it seems plain to me, would work to stimulate more care and accuracy on the part of contractors than would the allowance of offset. To that extent, the Government's construction would further the legislative purpose of encouraging care and accuracy.

As for "buying in", the court thinks that permission to offset would not affect that practice. I believe that the contractor's position here would somewhat tend to encourage "buying in" more than the Government's. Under the former, a bidder attempting to "buy in" could feel that, if the Truth-in-Negotiations Act happened to come into operation—at the end of the contract, after generous modifications had upped the total contract price—he would probably get substantial advantage from some of his deliberate understatements at the beginning; this prospect would tend to abet his taking a chance on "buying in" on his initial proposal, in the hope of ending up with a good profit, not a loss. On the other hand, if offsets are disallowed, the bidder knows that, if the Act is ultimately applied, he will not get any succor from these intentional errors against himself; his hoped-for profit could be reduced substantially, if and when the Act is applied, or there might even be a loss. The risk of "buying in" is thus somewhat greater if there are no offsets.

These reasons, I have emphasized, are by no means compelling, but for me they are enough when all the other indicators seem to add up to zero. I add that the offsets here do not involve the same specific items and therefore I do not have to consider, and would reserve, the question of whether a limited offset, or netting, is allowable in that circumstance. See ASPR 3–807.5(3), as amended by Defense Procurement Circular No. 57.

Similarly, the plaintiff conceded in oral argument that it would make a profit on the contract even if offsets were disallowed. Accordingly, I do not reach, and would defer, the issue of whether the Act should be construed to reject offsets where that would impose an actual loss on the contractor (a loss which would not exist if offset were permitted). Since the Act is primarily concerned with regulating the contractor's profit, the loss case seems even more difficult to me than the instance, as here, in which some profit remains under either theory.

I join in the court's opinion on the Luneberg Lens (Part II).

NICHOLS, Judge (concurring in part, dissenting in part):

I rejoin in Part I of the court's opinion, but with all respect I think it is mistaken in Part II, dealing with the Luneberg Lens. It appears that plaintiff had before it, shortly in advance of the final award, a quotation to supply this component at a price considerably lower than the figure used in plaintiff's statutory cost or pricing data which it had furnised to defendant. The latter was based on the quotation of AGA, an established supplier of the component. The former had come from Transco, which desired to supply the item, but had no previous experience with it. Plaintiff's officials concluded that the statute and the implementing contract clause did not require them to notify the defendant of Transco's quotation because there was, as they tentatively thought, no real possibility that Transco would be able to lower the procurement cost of the item to them. What loses the case for them here is that they were following through with Transco to be absolutely sure of their tentative conclusion. Had they tossed its proposal in the waste basket, they would now be in free. The proposal turned out to be more serious than they had thought. Eventually they did obtain components from Transco, not at the original quotation, but still perhaps at some saving. How much saving is not yet known.

The evidence, the findings of the Board, and the prevailing opinion here, all speculate that the Government negotiators would have used the Transco quotation, if they had known of it, either to reduce the target cost or to reserve the price for this component for future determination, though the Board rejected the first alternative. I think this technique obscures the real point of the case, anyway.

The statute and contract clause involved were comparatively new when the instant award was made. Experience with them, and decisions under them, were lacking. It can hardly be doubted that the terms "cost or pricing data" may include or exclude many things. They are, therefore, ambiguous. There can be no speculation whether the plaintiff participated in drafting the language. Obviously it had no part. It seems to me that the usual consequence should follow. That is, the defendant, not having notified contractors what it construed the language to mean, was bound by whatever meaning contractors might reasonably attach to it.

It is obvious from a reading of our cases, and common knowledge, that many persons "buy into" Government contracts and subcontracts, to use the phrase used in the majority opinion. That is, they bid below cost, or without adequate cost information, confidently relying on their beneficent Government to bail them out somehow if necessary. In many instances, the unlucky Government has no alternative but to do so, the item to be supplied being urgently needed and other possible sources having ceased to be available. The result is, a surprisingly low quotation from a party not established as a responsible supplier must always be regarded at first with some suspicion. The initial attitude of plaintiff's officials toward the Transco quotation is understandable in view of this, and its good faith is not challenged. There may often be, and there apparently was here, a wide margin between the nominal cost of a component, measured by the lowest quotation, and what good judgment tells one it is probably going to cost. If defendant wanted to learn of the lowest quotation, however apparently undependable, as its "cost or pricing data," it had only to say so. Such a pronouncement would have precluded any litigation as to the Luneberg Lens item. Instead, defendant left our plaintiff to figure out for itself what defendant's words meant. Plaintiff (as I read the record) concluded that defendant wanted to have plaintiff's honest estimate as to what the lens was going to cost. I cannot for the life of me perceive why this conclusion was unreasonable. If it was reasonable, we ought to sustain it.

Defendant, in properly implementing the statute, also should have specified as of what date the cost and pricing data should speak. Was it to be continually revised as fresh information came in, even after the contract negotiation was substantially complete?

It appears to me the Congressional purpose was to prevent contractors from abusing the otherwise approved incentive type contract, by supplying cost data including costs they know or should know before award they will not incur. They were not, however, to be denied the bonus offered them, in case of savings effected by managerial efforts and efficiency, after award, even though they anticipate before award they will seek such savings. Incomplete as are the facts before us at this stage of the litigation, it appears to me that whatever the savings were from the subcontracting with Transco instead of AGA, it is probable that little of them could have been predicted just from Transco's low quotation. It may turn out there were none after allowing for the technical assistance plaintiff rendered Transco and for what the Board calls the "contingency factor." If there were savings they were due, it appears, to plaintiff's voluntary assumption of risk in dealing with an unknown supplier and to the help plaintiff extended to that supplier. Plaintiff, by dealing with Transco, could well (antecedently con-

sidered) have raised its real costs instead of lowering them. Thus it appears to me, if plaintiff had looked beyond the literal language of the statute to its apparent purpose, it would have felt justified in supplying only the data it did.

I am not suggesting, however, that plaintiff could properly or safely have ignored an express statement by defendant as to what it wanted. It is obvious that defendant's agents and servants must always be the best judges of what cost and price data are relevant to their needs. I am saying they cannot reasonably expect contractors to intuit what they want. If they maintain silence in the premises, they are bound by whatever reasonable interpretation contractors apply to the involved statute and contract clause. The decision today is, I think, inimical to the effective use of the incentive type contract to encourage efficiency and cost savings in Government procurement.