**LOCKHEED AIRCRAFT CORPORATION, LOCKHEED–GEORGIA COMPANY DIVISION**

v.

**The UNITED STATES.**

No. 250–67.

United States Court of Claims.

Oct. 16, 1970.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiff. David V. Anthony, Sellers, Conner & Cuneo, Washington, D. C., Harry S. Baxter, Atlanta, Ga., Albert C. Tate, Jr., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., of counsel.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, Washington, D. C., for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge.

This case comes before the court for Wunderlich Act review (41 U.S.C. §§ 321, 322) of a decision of the Armed Services Board of Contract Appeals (hereinafter referred to as the ASBCA or the Board), in Lockheed Aircraft Corporation, Lockheed-Georgia Company Division, ASBCA No. 10453, 67–1 BCA, ¶ 6356, p. 29,439 (decided May 18, 1967). The court is called upon in this companion case to Cutler-Hammer, Inc. v. United States, 416 F.2d 1306, 189 Ct.Cl. 76 (1969), to further interpret the "Price Reduction for Defective Cost or Pricing Data" clause ("the Defective Pricing Clause").

Plaintiff Lockheed had a $10,500,000 negotiated fixed-price contract with the Air Force to develop and produce an electronic Malfunction Detection and Recording System (MADREC). This was a system to be installed in B–52 aircraft. The Air Force had awarded a letter contract to plaintiff on May 4, 1962. One component of MADREC was the 813LQ recorder, and in anticipation of the award of the prime contract, plaintiff solicited a proposal from Midwestern Instruments, Inc. for the recorder.

Since Midwestern had not yet developed the 813LQ recorder, it submitted a price proposal of $14,078.17 per unit on February 13, 1962, based on the 812L

recorder which had been previously produced. Included in the price proposal were cost estimates for the anticipated difference between the 812L and the 813LQ models.

Following a series of negotiations and meetings, an audit and price analysis were performed by Lockheed on May 15, 1962. On June 1, 1962 there was a price reduction to $13,857 per unit, and on June 6 the unit price was further reduced to $13,681.50. This latter price was definitized into a subcontract entered into on June 6, 1962.

The June 6, 1962 subcontract price was included in plaintiff's own price proposal, submitted to the Air Force in July 1962. In September 1962 an Air Force Audit and Price Analysis team visited Midwestern's plant, where it examined records and made production studies. By this time, Midwestern had delivered about 30 recorders to plaintiff. A price reduction of $281 per unit was negotiated by the Air Force team with Midwestern, after which the Air Force team prepared an Audit Report and a Price Analysis Report, reflecting such reduction.

During February and March 1963, plaintiff and the Air Force were negotiating to make definite their contract. The letter contract was finally definitized on April 15, 1963, and made effective retroactive to May 4, 1962, the date of the original letter contract. The prices in the prime contract reflected the Midwestern prices as amended by the reduction negotiated with the Air Force.

In the early fall of 1963, the General Accounting Office (GAO) began a four-month audit of the contract. The audit revealed that the total unit price for purchase parts for the 813LQ recorder should have been $1,530 instead of $2,070. Lockheed thereafter conducted its own three-day price survey of Midwestern's accounts in April 1964, and found merit in GAO's findings. The Air Force also conducted an audit. After communications between all the parties, the Contracting Officer on October 19, 1964 made a formal demand on Lockheed for

a refund of $234,623 (the amount suggested by GAO) on the basis of Midwestern's overstatement of material and labor costs.

The demand for a refund from Lockheed was made pursuant to the following provision in the definitized price contract:

PART XVIII—PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (NOV. 1962)

(a) If the Contracting Officer determines that any price, including profit or fee, negotiated in connection with this contract was increased by any significant sums because the Contractor, or any subcontractor in connection with a subcontract covered by (c) below, furnished incomplete or inaccurate cost or pricing data or data not current as certified in the Contractor's Certificate of Current Cost or Pricing Data, then such price shall be reduced accordingly and the contract shall be modified in writing to reflect such adjustment.

\* \* \* \* \* \*

The foregoing contract clause was made inapplicable to subcontracts which were "definitized prior to contractor's receipt of a fully executed copy of this document except to the extent the subcontractor was previously subject to the requirements of such clauses by the terms of the subcontract." Midwestern's contract was definitized before Lockheed's; nonetheless, the subcontract contained its own version of the Defective Pricing Clause, which was substantively the same as the clause in the prime contract.

Lockheed appealed the demand of the Contracting Officer to the ASBCA. The Board upheld the Contracting Officer's decision with respect to the material cost, and therefore denied the appeal in that regard. The Board held, however, that the Contracting Officer's decision that direct labor costs had been overstated was incorrect, and sustained the appeal to that extent. Finally, Midwestern tried to offset royalties and development costs

that it had overlooked and excluded from its estimated proposal. The Board held that since these two cost items were only "remotely related" to the "material costs" in issue, there could be no offset, since "the equitable reduction permitted under the clause is intended to cover solely the cost items concerning which the pricing data was defective. To permit unrelated offsets would be tantamount to repricing the entire contract, which is not within the contemplation of the clause." 67–1 BCA at p. 29,450.

Plaintiff is now appealing the decision of the Board regarding the "material cost" overstatements and the disallowance of offsets. Both sides are moving for summary judgment.

We feel it is important to note, at this juncture, that this case is the product of a demand made by the Government upon Lockheed, as a result of alleged overstatements in price made by its subcontractor, Midwestern. Although this is a case of first impression, insofar as the issue of subcontractor overstatements are concerned, this court has had occasion previously to consider P.L. 87–653,[1] the Defective Pricing Statute, and the clause adopted pursuant to it, in *Cutler-Hammer, Inc., supra*. In that case we held, in part, that the prime contractor was under an obligation to furnish information concerning costs. We stated:

Public Law 87–653 was intended to apply to situations where the data supplied was incomplete, inaccurate, or noncurrent. It was aimed at cases where costs were known, but information about them was withheld. The statute (and the contract clause which is utilized pursuant to the statute) speaks in terms of *"Defective* Pricing." If a cost is known when the contract price is being negotiated, it must be furnished accurately, completely, and on a current-price basis. If the contractor purchases components from a subcontractor, these costs are also subject to the Defective Pric-

ing Clause. 416 F.2d at 1311, 189 Ct.Cl. at 84.

The court is now faced with the question as to added responsibility of a prime contractor for overpricing by its subcontractor. Plaintiff's contract with the Government contained the same Defective Pricing Clause at issue in *Cutler-Hammer, Inc., supra*. Plaintiff's contract with Midwestern also contained such a clause, somewhat different in language, but the same in substance. The action by the Government to reduce Lockheed's price is pursuant to the contract between plaintiff and defendant; the subcontract's clause governs the rights and duties of the parties to the particular subcontract.

## I—*Material Costs*

The Board found that shortly after submitting its proposal to Lockheed in February 1962, Midwestern began to make substantial purchases of materials for use in fabricating the recorders, and that by June 1 or June 6, 1962 Midwestern had purchased in excess of 90 percent of the materials needed. The negotiated materials costs in June 1962 and September 1962 were found to exceed the costs gotten from reasonably available data by about $700 and $500 respectively.

Plaintiff argues that Midwestern satisfied the requirements of the Defective Pricing Clause when it allowed the Air Force pricing team to inspect its Kardex file. This is an accounting system in which the price of each item of material ordered is recorded on a card which also contains the prices paid in previous purchases of the item. The material costs are thus segregated by item and not by end-product.

Since it was not possible for the Air Force price team to accurately audit Midwestern through use of the Kardex file, a member of the team asked for a bill of materials on the 813LQ recorder. He was told that *this was not available*, but that it could be prepared within two weeks. Due to the shortness of time

1. 76 Stat. 528, 10 U.S.C. § 2306(b) (1964).

which the team had, this offer was unacceptable, and the bill of materials was not prepared.

Had the team been given a bill of materials on the 813LQ recorder during its two-day investigation, it is fair to say that it would have found evidence of cost overstatements. The information which it was afforded, *i. e.*, the Kardex file, did not clearly indicate the overstatements. It is true that the actual costs may have been contained on the Kardex files; however, so were many other prices for the same items, and it was impossible for the team to separate out the costs attributable to the 813LQ recorder from costs attributable to other products with which they were not concerned.

Plaintiff also contends that there was no available evidence which was withheld from the Air Force, and that Air Force could have inspected the purchase orders to ascertain relevant costs. Such an examination may have been informative, but merely looking at the Kardex file, which did not indicate to what use the various items were put, would not have put the Air Force on notice that there were purchase orders relating to the 813LQ recorder.

When the Kardex file was supplied to the Air Force team, Midwestern knew that it had already obtained firm prices on much of its materials. The Air Force may have seen recent prices listed; but they could not know that these prices related to the 813LQ recorder.

■ Assuming, however, that there were indicia in the Kardex file as to what the true material costs were, we still are of the opinion that there is a *duty* on the part of the subcontractor to completely disclose this information. We stated as much in *Cutler-Hammer, Inc., supra*:

> * * * If a cost is known when the contract price is being negotiated, it must be furnished accurately, completely, and on a current-price basis. *If the contractor purchases components from a subcontractor, these costs are also subject to the Defective Pric-*

*ing Clause* [Emphasis supplied] 416 F.2d at 1311, 189 Ct.Cl. at 84.

We reiterate that proposition here. This is especially true in the factual context presented here, where the Kardex file, itself a cumbersome accounting system, contained over 600 line items for a component of the larger MADREC system.

By stating that there is a duty to disclose, we are not requiring the use of any particular accounting system. All that is required is a clear setting-out of actual costs associated with the particular project. The Kardex file, with its mixed potpourri of disparate prices, did not satisfy this requirement.

■■ Although the Kardex file does not seem to us to satisfy the requirements of the Defective Pricing Clause, a bill of materials would have. Midwestern did offer to supply this within two weeks of the September audit. While the Air Force team said it could not wait, this refusal did not absolve Midwestern of the responsibility to accurately divulge the real prices it had paid for materials. The purpose of the statute is not to give the Government one chance to request information as to what costs were incurred by the contractor or subcontractor; rather, the purpose is to have the contractor furnish costs which are complete, accurate, and on a current-price basis. If the contractor, or subcontractor, knows the actual costs, and the government does not, then the only way to further the purpose of the statute, and to implement the clause, is to require complete disclosure. If the Government is furnished with a clear set of costs, and then does not make any use of them, the Government cannot then be heard to complain. But a contractor cannot fail to meet its disclosure requirement.

The facts of this case substantiate the finding of the Board that

> * * * the subcontractor did not inform Lockheed or later the Air Force that it had already obtained firm prices on a substantial amount of materials. In no other way did the subcontractor make the other parties aware

of the existence of this significant information. * * * 67–1 BCA at p. 29,446.

Whether the Air Force thus relied on its own audit, as opposed to Midwestern's records, is immaterial. Since the September 1962 Air Force audit was based on the information in the Kardex file, which we have found to be deficient when measured against the requirements of the Defective Pricing Clause, and since this audit was not supplemented, even at a later date, by the more accurate, complete and current information in the hands of Midwestern, the cause of the overstatements in price must ultimately be attributed to Midwestern. In the last analysis, therefore, Midwestern caused the overstatements. The Air Force audit merely reflected the inaccuracies inherent in the Kardex, uncorrected by an adequate bill of materials on the 813LQ recorder which should have been supplied by Midwestern.

█ Although it appears that Lockheed was not at fault here, it still must bear the responsibility, at least as far as the Government is concerned, for the overstatement of costs. The Government's contract was with Lockheed, and the Defective Pricing Clause in plaintiff's contract with the Government deals with *all* overstatements, whether the inaccurate data was originally furnished by the contractor or its subcontractor. Since the inaccurate prices were included in plaintiff's negotiated price, the Defective Pricing Clause clearly allows the Government to reduce the prime contract price. Moreover, it would be unreasonable to force the Government to proceed against Midwestern. Even if the overstatements were recovered from Midwestern, the profit made by Lockheed on these overstatements would not be recovered. The more reasonable route is to hold Lockheed itself responsible to the Government. Lockheed can then proceed against Midwestern, based on the Defective Pricing Clause incorporated in their subcontract.

In our opinion, the evidence indicates that the Government was not furnished with current cost and pricing data, and that the lack of such data resulted in overstatements in the contract price. Thus, the Government is entitled to a reduction in the contract price for material cost overstatements.

## II—*Offsets*

In *Cutler-Hammer, Inc., supra,* we held that the Defective Pricing Clause allowed the setting-off of understatements against overstatements to the extent of the overstatements. Although the type of contract in *Cutler-Hammer* was different from the type of contract here, the Defective Pricing Clause is the same, and the reasoning behind allowing offsets in *Cutler-Hammer* justifies allowing them in this case as well.

In *Cutler-Hammer*, we were presented with a situation where the contractor had a negotiated Fixed-Price-Incentive-Fee (FPIF) contract. An FPIF contract is one in which the contractor estimates his costs (target costs), and a percentage of these costs are added as a profit figure, to arrive at a target price. Cost savings below the target costs or expenditures above it are shared by the contractor and the Government on a percentage basis.

In analyzing the legislative history of the statute, the court discussed at great length the need for accurate disclosure of costs in incentive contracts. The incentive contract was a special concern of Congress because it had often been employed to earn "unearned profits." This came about when costs were deliberately overstated by the contractor, so that when the item was eventually produced for less, the contractor would get an incentive fee in addition to his normal profit. It was the intent of Congress to limit the incentive fee to situations where savings were due to efficiency of production, rather than originally inflated costs. Hence, the Government was given the power to reduce the contract price when costs were not stated completely, accurately or currently.

Although the contract involved in the instant case is a fixed-price contract, with no incentive feature, the Defective Pricing Clause was nonetheless intended to apply to it as well, as shown by the legislative history. A Senate Report states:

> In determining the price under many types of negotiated contracts the Government must rely, at least in part, on cost and pricing data submitted by the contractor or his subcontractor. In recent years the General Accounting Office submitted several reports to the Congress on cases in which contractors received unwarranted profits because the data used in establishing target costs or prices were inaccurate, incomplete, or out of date. *Although many of these reports were on incentive contracts, the objective of avoiding enhanced profits through failure to inform the contracting agency of the most current, accurate, and complete cost data is equally desirable in other types of negotiated contracts.* [Emphasis supplied] S.Rep. No. 1884, 87th Cong., 2nd Sess. (1962), p. 3, U.S. Code Cong. & Admin.News 1962, p. 2477.

It is only natural that the Defective Pricing Statute should apply to a negotiated fixed-price contract, since overstatements in cost will lead to additional profit just as they do in negotiated FPIF contracts. In fact, if there is an underrun in a fixed-price contract, the contractor reaps the *entire* benefit of the saving; in an FPIF contract, however, the savings are shared by the Government and the contractor.

The reason we allowed offsets to the extent of overstatements in *Cutler-Hammer,* was that including both understatements and overstatements in a price proposal negated any attempt on the part of the contractor at creating "artificial savings." This allows them to cancel each other out, at least to the extent of the overstatements, and means that only savings which were brought about through "demonstrated performance of the work" would be available as added profit. This means that the savings were the product of efficiencies of production, and not through the use of inflated cost estimates. In a fixed-price contract, as in an FPIF contract, costs are estimated, and a profit figure is added. If the contractor produces the product for less than his negotiated price, he keeps all the savings (absent any possible renegotiation or other contingency which would limit his profit). Thus, the same manipulation of costs which led to inflating costs in FPIF contracts is possible with a fixed-price contract. Similarly, allowing the offsetting of understatements against overstatements in a fixed-price contract, limited to the extent of the overstatements, leaves only those savings which are the result of "demonstrated performance of the work."

The allowance of offsets does not give the contractor a windfall, nor does it penalize the Government. In both the *Cutler-Hammer* situation and the one which prevails here, allowing offsets according to our formula merely allows the setting of the negotiated price in an amount which reflects the true costs. If overstatements exceed understatements, the Government is still allowed to *reduce* the contract price by the amount of the excess. No raising of the price is allowed, however.

### III—Conclusion

In accordance with our opinion, the Government is allowed to reduce Lockheed's contract price by the amount of the overstatement resulting from its subcontractor Midwestern's defective material cost data. However, Lockheed is to be allowed to offset against this overstatement, to the extent of that overstatement, the royalties and development costs that Midwestern had overlooked and excluded from its estimate.

Originally, $234,623 was deducted from amounts due plaintiff to make up for the reduction in contract price as a result of overstatements. Following the appeal to the ASBCA, the case was remanded to the Contracting Officer to redetermine the amount of overpricing,

consistent with the Board's decision that labor costs had not been overpriced, and with its determination that no offsets were to be allowed. Since that time, plaintiff has been refunded $42,746, an amount representing the alleged labor cost overruns which the Board found were erroneously withheld from plaintiff. Plaintiff, however, does not agree that the amount is correct.

In view of our decision that the Government can reduce Lockheed's price, but that offsets are to be allowed to the extent of overstatements, the Board will have to make a new determination of the amount by which the Government was entitled to reduce plaintiff's contract price, with the remainder to be refunded.

Accordingly, plaintiff's motion for summary judgment on the "Material Costs" issue is denied, thereby affirming the Board and plaintiff's motion for summary judgment on the "Offsets" issue is granted, thereby reversing the Board. Defendant's cross-motion for summary judgment is therefore granted as to the "Material Costs" issue, and denied as to the "Offsets" issue. Judgment is entered for plaintiff on the "Offsets" issue, with proceedings suspended pursuant to Rule 167 for a period of 90 days. The petition is dismissed as to the "Material Costs" issue.

DAVIS, Judge (concurring):

I join in Parts I and III of the court's opinion. As for Part II, I concur in the result of that discussion on the authority of Cutler-Hammer Inc. v. United States, 416 F.2d 1306, 189 Ct.Cl. 76 (1969). I agree with the court that the principles of that opinion require allowance of the offsets here.