The UNITED STATES, Appellant,

v.

ROGERSON AIRCRAFT CONTROLS, Appellee.

Appeal No. 85–2058.

United States Court of Appeals, Federal Circuit.

March 6, 1986.

George M. Beasley, III, Sr. Trial Counsel, Commercial Litigation Branch of the Dept. of Justice, Washington, D.C., for appellant. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., and David M. Cohen, Director. Also on brief were Donald J. Kinlin and Major Peter R. Held, of the Office of the Chief Trial Atty., Dept. of the Air Force, Wright-Patterson AFB, Ohio.

James J. Gallagher, of McKenna, Conner & Cuneo, Los Angeles, Cal., for appellee. With him on brief was Thomas M. Abbott, McKenna, Conner & Cuneo.

Before DAVIS, Circuit Judge, MILLER, Senior Circuit Judge, and NEWMAN, Circuit Judge.

DAVIS, Circuit Judge.

The Truth in Negotiations Act, 10 U.S.C. § 2306(f), requires that (1) certain Government contractors and would-be contractors must certify, to the best of their knowledge and belief, that the "cost or pricing data [they] submitted [to the Government] was accurate, complete and current," and (2) any contract under which such a certificate is required shall contain a provision that "the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor ... [furnished data that] was inaccurate, incomplete or noncurrent." [1]

The question arose whether, in determining the adjustments necessary to exclude such price increases due to cost or price *overstatements*, the contractor could offset

---

1. To implement this legislation, the Government mandated the inclusion, in contracts covered by the Truth in Negotiations Act, of a uniform clause entitled "Price Reduction for Defective Cost or Pricing Data."

errors *understating* the original price. An affirmative answer was given by our predecessor, the Court of Claims, in *Cutler-Hammer, Inc. v. United States*, 416 F.2d 1306, 1309–13, 189 Ct.Cl. 76 (1969). But that case did not involve understatements intentionally and deliberately made by the contractor, and though the court's language is not absolutely clear we can properly assume that the decision did not cover that situation. Some years later, in *Lockheed Aircraft Corp. v. United States*, 485 F.2d 584, 586–87, 202 Ct.Cl. 787 (1973), the Court of Claims carefully avoided, when it unanimously overturned a determination by a Board of Contract Appeals that the understatement in that instance was in fact intentional, any holding that intentional understatements were in the same category (for offset purposes) as unintentional errors.

The current Government appeal from a "defective pricing" determination by the Armed Services Board of Contract Appeals (ASBCA or Board), permitting the appellee contractor to offset its understatements, asks us now to decide directly and broadly that all intentional errors of understatement fall outside the *Cutler-Hammer* rule. We cannot, however, take that general position in this case because, on the facts found below (which are not challenged), the Government's contracting agencies were fully aware (at all relevant times) of the understated errors and their extent—and, assuming that the contractor made those errors "intentionally," we hold that such "intentional" errors of which the Government knew full well are not excluded from the *Cutler-Hammer* holding. Accordingly, we affirm the ASBCA, leaving still undecided by this court the issue whether a deliberate, deceptive (or misleading) understatement (*i.e.*, an intentional understatement which is unknown to the Government) can be offset in a "defective pricing" case.

## I.

The facts found by the ASBCA—which both sides accept—were as follows: In 1980 the Government issued a request for proposal to appellee Rogerson Aircraft Controls (Rogerson) to manufacture 223 outlet valves; Rogerson was the only known source for these items, and the Government's need was urgent. Rogerson submitted a unit price proposal of $909, the same price as in an earlier contract between the same parties for that article. Upon the Government's insistence, Rogerson later submitted a number of cost/price breakdowns to support its proposal. Before the oral price negotiations between Rogerson and the Government began on January 30, 1981, the contractor's price was lowered to $891.34 for each unit to be supplied under the proposed contract. At that same stage (December 1980) the raw material amount in the cost/price breakdown was $78.67 per item, the material overhead rate was 12.9%, the manufacturing labor overhead rate was 250%, and the G & A rate was 28%.

For bidding purposes, Rogerson's usual practice was to use the rates for material overhead, manufacturing labor overhead, and G & A for the fiscal year immediately preceding the year in which a bid was initially submitted. For the first nine months of Rogerson's FY 1980 (the company's fiscal year ended on November 30) these rates, in actual fact, were 26.6% for material overhead, 319.5% for manufacturing labor overhead, and 33.4% for G & A. The lower rates in the December 1980 cost/price breakdown were chosen as a result of a "management estimate."

The important fact, for us, is that the ASBCA specifically found that Rogerson, the Government auditor, and the Government negotiator all knew—before the oral price negotiations began at the end of January 1981—that Rogerson's actual material overhead, manufacturing labor overhead, and G & A rates for the first nine months of the contractor's FY 1980 were the higher figures we have set out in the preceding paragraph. Rogerson itself disclosed these facts to the Government personnel before the negotiations commenced.

Oral price negotiations began (as we have said) on January 30, 1981; they ended

on February 18, 1981, with agreement on a final unit price of $859.46. In agreeing to that figure, the Government negotiator used the rates for material overhead and manufacturing labor overhead which had been included in Rogerson's cost/price breakdown submitted to the Government in December 1980, but used the actual figure of 33.4% for the G & A rate.[2] Also on February 18, 1981, Rogerson's representative certified that the data submitted in support of its proposal were accurate, complete and current as of that date (including the numbers for raw materials, material overhead rate, manufacturing labor overhead rate, and G & A rate submitted in December 1980). The contract was awarded to appellee on February 25, 1981, and included the clause for "Price Reduction for Defective Cost or Pricing Data" (see footnote 1, supra).

After the contract award, the Government determined, on post-audit, that the most accurate, complete and current cost data available to Rogerson for the raw material item (as certified on February 18, 1981), was $16, and not the $78.67 Rogerson had certified. The contracting officer therefore reduced the unit contract price by $113.68 for the difference between the $16 cost and the raw materials cost (as certified) plus other overstated items incorrectly certified.

On Rogerson's appeal to the ASBCA, the parties stipulated that the raw materials unit cost was overstated by $61.91, but the contractor contended that nevertheless no such price decrease should be allowed. The five-member Board majority decided, first, that, even if the undisclosed raw material cost ($16.76) had been disclosed during the price negotiations, there would have been no reduction in the final price, and, second, that the understatements in

the various rates fully offset the overstated raw material figure, and therefore the Cutler-Hammer ruling covered those understatements even though they were intentional. Two members of the Board dissented on the ground (among others) that Rogerson's understatements were not proper offsets because they were intentionally made.

The Government's appeal to this court proffers solely the question whether an intentional understatement of costs automatically disqualifies that understatement as an offset.

## II.

In the technical sense that they were deliberate rather than inadvertent, or due to neglect, or to pure mistake, the Rogerson understatements relevant to this case (manufacturing labor overhead rate; G & A rate; material overhead rate) can be denominated as intentionally made. But at the time of the contract negotiations those understatements were not at all in the class of intentional understatements that are designed to mislead or confuse the Government, or can have that effect. Prior to any negotiations on this valve contract, the Government's representatives were fully aware of the correct figures for those factors during the first nine months of FY 1980, and knew also that Rogerson's certified cost/price breakdown departed from those correct figures in the downward direction—that these factors were understatements in the certification. The federal representatives likewise were told by Rogerson that Rogerson's departures (as to those factors) in the cost/price breakdown were based on "management estimate."[3] After those disclosures, there could be no hint or possibility of deception or of mis-

---

2. The Board made no finding as to why the Government negotiator took this mixed course.

3. The Board did not find why Rogerson's personnel took the course of understating these costs in the cost/price breakdowns but during the same period revealing to the Government the true facts. The Government argues to us that the certified figures represented the Roger-

son management's best "business judgment" (and to that extent misled the Government that those would turn out to be the correct figures). But even if this was so (there is no such finding), the Government representatives knew fully what the past figures were in fact and could always evaluate the "business forecast" against the known facts of Rogerson's prior fiscal year.

leading. Instead, these numbers were clearly understatements, known to the Government as such, and the Government personnel could, if they wished, substitute (in their own calculations and negotiations) the true figures for the incorrect understatements. More than that, Rogerson itself had made plain to the Government, prior to the negotiations, that the true figures for the first nine months of FY 1980 were substantially higher than the comparable numbers contained in the certified breakdown. As far as the Government was concerned, there was full good faith on the part of Rogerson.

Assuming without deciding that there are some intentional understatements that are barred as offsets, we cannot include the understatements in this case within that rule. No purpose of the Truth in Negotiations Act would be served by the disqualification of these understatements—completely known to the Government at the time of the negotiations and in no way hindering or deceiving the Government. On the contrary, to apply the Government's proffered rule in this case would be the acme of automatic or mechanical jurisprudence, punishing the contractor for understatements which had and could have no impact on the Government's action in entering into this contract.

For this reason, we need not consider or delve into the Board's holding that, if the overstatement of raw material cost had been disclosed during the negotiations, the two parties would still have agreed on the same price. Whether or not this was a permissible conclusion is wholly irrelevant in our view. The ASBCA expressly found that the total amount of the understatements, which we have just ruled to be qualified as offsets under *Cutler-Hammer,* was greater than the admitted overstatements. There was a complete offset, and therefore Rogerson's appeal to the Board was properly sustained.

### III.

Though we uphold the determination below, we do not answer the broad question the Government has presented. That issue must await another day and a different case appropriately raising the qualification as offsets of intentional understatements designed to mislead or confuse the Government, or having that effect.

AFFIRMED.