CONRAC CORPORATION

v.

The UNITED STATES.

No. 368–74.

United States Court of Claims.

July 8, 1977.

Robert D. Witte, Bronxville, N. Y., attorney of record, for plaintiff.

Stephen G. Anderson, Washington, D. C., with whom was Asst. Atty. Gen. Barbara A. Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, KUNZIG and BENNETT, Judges.

BENNETT, Judge.

This appeal under the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970), before the court on defendant's request for review of Trial Judge Francis C. Browne's opinion filed June 28, 1976, raises two questions of interpretation of the so-called Truth in Negotiations Act, 10 U.S.C. § 2306(f) (1970) (hereinafter the Act). The Armed Services Board of Contract Appeals (the board) agreed with the contracting officer that the contract in issue was "overpriced," due to insufficient cost information disclosure to the Government by the contractor, though it lowered the amount of the refund to the Government ordered by the contracting officer, concluding that $8,050 was due from the contractor.[1] The trial judge reversed, finding that the contractor owed no part of that amount because its cost disclosure to

the Government had been adequate, and, independently, because the sum determined by the board was too small to be made the subject of a mandatory refund under the Act and the contract. We cannot accept the trial judge's analysis, and we enter judgment for defendant, sustaining the ruling of the board.

Plaintiff is the successor in interest to Giannini Controls Corporation, the original party to the contract in issue. Its problems giving rise to this litigation can be traced back to July 1966, when the Navy apparently ran short of time in making a procurement. On July 26, 1966, Giannini received an urgent telephone call from a Navy procurement negotiator, asking it to ready a quotation "before the end of the week" for delivery of 29 air data computers. Giannini was the sole source supplier of these computers, known as the 560T27–1, which were used in the flight control system of the Navy's C2–A aircraft. The contractor complied with the quotation request, the very next day offering the Navy a unit purchase price of approximately $20,000, even though a much longer period of time, from 4 to 6 weeks, would normally be allowed for assembly of the cost data and the resulting formulation of the asking price.

As required by the Act, Giannini also submitted to the Navy certain information it possessed on the cost of each of the some 500 component parts that comprised the 560T27–1 computer. Since Giannini's prospective sale would culminate in a "negotiated prime contract" with a military department "where the price is expected to exceed $100,000," the Act specifies that "[p]rior to award" of the contract the contractor must "submit cost or pricing data" and "certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current * * *."[2] The only cost data Gian-

1. *Conrac Corp.*, ASBCA No. 15964 (contract No. N00383–67–C–0551), 74–1 BCA ¶ 10,605 (Apr. 11, 1974).

2. "(f) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current—

nini so submitted was a priced bill of materials (BOM) dated June 24, 1965, showing the item-by-item breakdown of estimated material costs for the components of a computer, the 560T1–2A, almost identical to that slated for procurement.[3] Giannini did not disclose, nor did the Government's negotiator know of the data on, the firm's purchase history cards, which listed for each computer component the quantities and prices of previous purchases.

No attempt was made by Giannini to update the 1965 BOM given the Government, to reflect the firm's component cost experience in the 11 months intervening the BOM and the 560T27–1 quotation. This was not undertaken simply because, as indicated earlier, up to 6 weeks would usually be needed to ascertain the most recent purchase costs, not then recorded on the purchase history cards, and compile all the cost data from the cards into an itemized materials cost estimate. The urgency of the prospective procurement did not allow for such delay. Therefore, the negotiators for Giannini and the Navy worked from the 1-year-old BOM agreeing to make judgmental adjustments to account for the age of the cost information as well as the fact that the quantity of computers slated for procurement, 29, differed from the quantities for which costs were projected in the BOM, 6, 12, and 18. The Government's negotiator pressed for a 4-percent reduction in the direct material cost proposed by Giannini (roughly $7,900 of the $20,000 unit price), to compensate for the BOM's age and quantity differences, but in the end compromised on a 2-percent reduction. On August 18, 1966, Giannini and the Navy agreed to a unit price of $18,900, amounting to a total contract price of $548,100. Also on that date, the contractor executed the certificate of cost information disclosure required by the Act and the (yet to be signed) contract's Price Reduction for Defective Cost or Pricing Data clause implementing the statute. Although its purchase history cards then contained component cost data of more recent vintage than the 1965 BOM, including information current as of 6 weeks before negotiations began, Giannini submitted none to the Government.

The negotiated computer sale contract was executed on September 19 and proceeded to completion. The contractor experienced no further difficulties on its account until 1970, when it was selected for audit. As a result of two audits conducted that year, and a failure to resolve differences

"(1) Prior to the award of any negotiated prime contract under this title where the price is expected to exceed $100,000;

\* \* \* \* \* \*

"Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or noncurrent: *Provided*, That the requirements of this subsection need not be applied to contracts or subcontracts where the price negotiated is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, prices set by law or regulation or, in exceptional cases where the head of the agency determines that

the requirements of this subsection may be waived and states in writing his reasons for such determination.

"For the purpose of evaluating the accuracy, completeness, and currency of cost or pricing data required to be submitted by this subsection, any authorized representative of the head of the agency who is an employee of the United States Government shall have the right, until the expiration of three years after final payment under the contract or subcontract, to examine all books, records, documents, and other data of the contractor or subcontractor related to the negotiation, pricing, or performance of the contract or subcontract."

3. The specifications of the 560T1–2A computer (previously procured) and the 560T27–1 computer (the subject of the current negotiations) differed only in that two amplifiers and two modules of the 560T1–2A specifications were to be omitted and "dummy" items were to be substituted in the 560T27–1 computer to complete the electrical circuits.

held by the contractor and the Navy over the information that the audits disclosed, the contracting officer for the computer sale contract issued a final decision on December 8, 1970, determining that the contract had been "overpriced" by $14,158 and that a refund was due the Government in that amount. The overpricing was said to stem from the excess of the 1965 BOM costs over the lower costs shown to exist on purchase history cards at the time of the price negotiations, for 15 high dollar value computer components. Giannini was thus implicitly held to have violated the requirements of the Act and the implementing contract clause, for failure to furnish the purchase history cards to the Government's negotiator. The contractor timely appealed to the board, which disagreed in part with the contracting officer and lowered the refund amount to $8,050.[4] The board sustained the use of the purchase history cards available to the contractor at the outset of the negotiations, but not disclosed to the Government, to justify a refund for failure to furnish accurate, complete, and current cost data. The board opined that "the natural and probable consequence of the nondisclosure is that the price as negotiated was overstated  *  *  *." However, the board absolved the contractor of any alleged wrongdoing in its failure to provide the Government with cost data more current than that in the contractor's possession on the date of certification, August 18, 1966.

■ Plaintiff attacks the board's decision on two grounds. First, it disputes the relevance and reasonable availability, and therefore the legal requirement, of disclosing the purchase history cards as they existed when negotiations commenced. On the point of relevance, plaintiff cites *Lockheed Aircraft Corp. v. United States*, 193 Ct.Cl. 86, 432 F.2d 801 (1970), for the proposition that the Act's disclosure requirements are not met by the furnishing of data in undi-

gested form, meaning the purchase history cards rather than an updated BOM. In *Lockheed*, raw purchase history data in a Kardex file was furnished to the Government's negotiators. This court held that such disclosure was not sufficient to inform the negotiators of the component prices, and thus inadequate to comply with the Act's strictures. It is clear from the opinion that the Kardex file presented information to the negotiators that was, in the court's view, so difficult to isolate and to understand as to be, in essence, worthless. Plaintiff derives from this the notion that the purchase history cards, which it deems equally useless in the form in which they existed during negotiations, need not have been shown to the Government's negotiator, since requiring the contractor to do so would have been to ask for a futile act. It concludes that the cards thus fall outside the Act's required disclosure.

There are two answers to plaintiff's reasoning. First, the equation of the Kardex file in *Lockheed* with the purchase history cards in this case is wholly unwarranted in light of the board's own fact-finding, at least for all that is explained in the papers before us. Though the trial judge agrees with plaintiff's point, nothing in his opinion takes issue with the facts as explicitly found by the board. The opinion of the board states that upon disclosure of the contractor's cards each side to the negotiations "would have been able, within the time that was then available, to make its own evaluation of the data in preparation for the price negotiation.  *  *  *  [W]e think it  *  *  *  reasonable to expect that the negotiators would have evaluated at least the high dollar items which would normally have the greatest impact on price. Had they done so, the price overstatement of the 15 items in issue here would have been discovered and considered in negotiations." 74–1 BCA at 50,290–91. The board

---

4. The board adjusted the claimed overpricing of $14,158 downward to the "round" figure of $10,000 and then, by taking into account a negotiated factor, attrition, general and administrative costs, and profit, arrived at a net over-

pricing figure of $8,050. Since plaintiff has already paid this sum, plus interest, in the amount of $9,765 to the Government, it seeks recovery of the latter figure.

found as a fact that the contractor's cards would have been useful to the Government's negotiator, a fact which clearly takes this case out of *Lockheed.* We see no reason on what we have been shown to allow plaintiff's general assertions of the supposed similarity of its cards with the *Lockheed* Kardex file to overcome the board's presumptively correct fact-finding and its expertise in dealing with such matters.

The second answer to plaintiff's relevance contention is that the *Lockheed* decision does not absolve a contractor from disclosure of whatever information he possesses, simply because there is not sufficient time, as in this case, to create a formal, updated BOM. *Lockheed* pronounced the data submission in that case inadequate in view of the fact that there had been time to assemble the component price information in a more readily usable form than the Kardex file, though the contractor did not do so. Such time, it is true, was not present in *Lockheed* before the pre-contract auditors reviewed the contractor's cost data, but it did exist thereafter, and it is evident from the court's thinking that a BOM compilation during the time that was available would have been useful in finalizing the pricing arrangements. Where, however, there was not time enough to prepare a BOM, in light of the urgency of the procurement, *Lockheed* does not say that less accessible but nonetheless useful price information need not be disclosed. To say otherwise would be to eliminate the Act effectively from operation precisely when it is needed the most, when information is difficult to come by. The rule in *Lockheed* is that the best price data must be furnished, not that data in less than prime form, because of time or other constraints, may handily be hidden from the Government. *Lockheed* thus cannot be relied on in this case to relieve the contractor from a duty to disclose the information on its purchase history cards simply because there was insufficient time to assemble that information in BOM form.

In addition to its contention that the purchase history cards were irrelevant, which

we reject, plaintiff argues that the cards were not readily available to it for disclosure to the Government, and thereby excepted from the Act's requirements. Plaintiff asserts that a regulation implementing the statute, ASPR 3–807.3(e), 32 C.F.R. § 3.807–3(e) (1966), requires only that "all facts reasonably available to the contractor up to the time of agreement on price and which might reasonably be expected to affect the price negotiations" be disclosed, and that the cards were not reasonably available because it would have taken too long a period to retrieve them. Assuming the regulation to mean that data not reasonably retrievable before the end of price negotiations need not be furnished to the Government, we still cannot agree that plaintiff is relieved of the duty to disclose the cards. The contention that the time required to pull and assemble the cards for use was greater than the negotiation period would allow plainly will not square with the facts found by the board. "Here, appellant [plaintiff] had a purchase history card system in effect and the raw or unevaluated data in question were readily retrievable therefrom. * * * [I]t would have been feasible for appellant, within the time that was then available, to pull the 500 purchase history cards from its files, reproduce them, and disclose the reproductions to the Government's negotiator for use in the negotiations." 74–1 BCA at 50,290. Plaintiff has shown us nothing to indicate that this finding of the board was in error, and absent such a showing, plaintiff will not be heard to ask the court to assume facts contradicted by the board's opinion. *Jefferson Constr. Co. v. United States,* 1369, 364 F.2d 420, 424, 176 Ct.Cl. 1363 (1966), *cert. denied,* 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967). The contention regarding reasonable availability of the cards is without merit.

■ The second ground on which the board's result is attacked lies in the provision of the statute and the implementing contract clause requiring that "significant sums" by which the contract is overpriced due to defective cost data disclosure are to

be refunded to the Government.[5] Plaintiff reads the provision to mean that only significant amounts of overpricing are subject to the refund requirement, and concludes from this that its refund amount, $8,050 out of a contract valued at $548,100, was not significant and therefore was beyond the Government's power to order a refund. The trial judge agreed with plaintiff, arguing at considerable length that the refund determined by the board was not significant enough to fall within the mandatory recoupment provision of the Act and the contract clause. The trial judge came to this result by comparing the $8,050 refund with other indices he deemed sufficiently analogous to show the meaning of "significant" as used in the Act and the contract. He noted, for example, that the $8,050 figure was less than the $10,000 minimum amount in controversy required to bring a case within general federal question jurisdiction, 28 U.S.C. § 1331 (1970), was under the probable cost to the Government of the present litigation, and was sufficient to escape refund in the case of a major overpricing error of a contract for less than $100,000 (because of the exemption of such contracts from the Act's requirements), such as a 10-percent error in a contract for $80,000.

We think that the trial judge's analogies cannot be permitted to control interpretation of the "significant sums" provision. The requirement of "significance" in the sum to be refunded should be read, we think, in the spirit of *Sperry Flight Sys. Div. v. United States*, 212 Ct.Cl. ——, 548 F.2d 915 (1977), keeping in mind that the Act in which the requirement appears was drawn for the benefit of the Government, to curb an abuse in procurement, rather than for that of the contractor. The exemption of significant sums appears in the context of a statute designed to limit a contractor's right to obtain or keep the full contract price where part of that price was generated in circumstances of cost data

nondisclosure to the Government's negotiator. The prime thrust of the statute is to remove the contractor's right to receive the overpriced amount. The exemption in a statute of broad remedial purpose in favor of the Government should be construed narrowly and in light of its intent. That intent, we perceive, was to relieve Government procurement officials of the necessity of pursuing every claim, however small, that the Government may have against a contractor under the Act, and to allow them instead to follow up on overpricing that they deemed meaningful in the context of the procurement process. We decline to make a holding that the provision requiring refund of significant sums vests in the contractor a right to amounts earned through supplying defective price data to the Government. *Sylvania Elec. Prod., Inc. v. United States*, 202 Ct.Cl. 16, 479 F.2d 1342 (1973).

The trial judge's objective of stopping the Government from incurring litigation expenses in excess of the amount sought to be recovered, though well-intentioned, is not attainable. As defendant points out in its brief, the contracting officer and board ordering the refund can never know in advance what the total litigation costs to the Government may be, for they cannot even know whether the contractor will challenge their decisions. Further, as defendant says, the cost of litigation in a case such as this is similar to the cost of prosecuting a tax case where no new law is being established. The objective in the latter action is not to come out ahead financially, but rather to encourage voluntary compliance with later collection attempts and in any event to discourage open, knowing violations of the revenue laws. Surely the Government may be conceded the right to enforce its procurement laws in the same fashion, however costly such enforcement may be.[6] On balance, administrative discretion must be

---

5. *See* note 2, *supra*.

6. Defendant also counters plaintiff's contention regarding the escape of overpriced amounts from refund in contracts of less than $100,000, arguing that the exemption is permissive only and that cost data disclosure requirements may contractually be imposed upon any contractor, even one whose contract is for less than $100,000.

trusted, and administrative expertise relied upon, to determine which overpricing claims should be pursued, and which should be left to lie. Assuming such discretion to be judicially reviewable for abuse, no such abuse has been demonstrated here. The board's standard for requiring a refund in this case, where it found the amount of the component price difference would likely have been the subject of meaningful negotiations, is a sound one, established within its authority, and we decline to disturb the result reached under it. We conclude that the amount of the refund determined by the board was a "significant" sum within the meaning of the Act and the contract clause, and therefore that plaintiff is obliged to make the refund.

■ Presumably as a precaution against our refusal to follow the trial judge's result, plaintiff raised several other arguments in its brief on the Government's appeal from the trial judge's ruling. The arguments are directed essentially to the board's asserted lack of jurisdiction to consider the claims that plaintiff itself brought to the board. Though we suspect that these arguments are frivolous, we will not rule on their merits, for our mere suspicion regarding their validity is far outweighed by our certainty that they were raised out of time. Under Court of Claims Rules 166(e) and 54(b), plaintiff had no more than 30 days (time extensions aside) to file its exceptions to the trial judge's opinion from the time that the latter was announced. Plaintiff failed to come within this time limit, for it waited until the filing of its brief in response to the Government's, well beyond the 30-day period, to raise the jurisdictional

arguments for the first time. No adequate explanation has been offered in justification for this delay. We therefore deem plaintiff's final arguments untimely and decline to address them. There is an additional reason, however, for refusing this jurisdictional challenge at this time—plaintiff did not suggest these jurisdictional defects to the board, for all that we have been shown, and thus may not now raise them to this court. *General Dynamics Corp. v. United States,* Ct.Cl., 558 F.2d 985 (1977); *H. R. Henderson & Co. v. United States,* 169 Ct.Cl. 228 (1965); *see also William F. Klingensmith, Inc. v. United States,* 205 Ct.Cl. 651, 505 F.2d 1257 (1974).[7]

For the foregoing reasons, we sustain the board in its reasoning and in its result. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

---

7. As to the merits of plaintiff's argument, curiously cast as a "jurisdictional" one and in any event out of time, that the Government's negotiator had somehow agreed to restrict the mandatory cost data disclosure to the 1965 BOM, we think that the response of the board was entirely adequate. It said: "Moreover, even if the parties had deliberately agreed in advance upon a cut-off date that would have relieved appellant of any duty to submit the data that became available after June 1965, during the 14 months between the date of the bill of materials and the date of certification, such an agreement would have been unreasonable and in

practical effect a waiver of the statute. In *M–R–S Manufacturing Co., supra* [203 Ct.Cl. 551, 492 F.2d 835 (1974)], the Court held that the duty of contractors to furnish the Government accurate, complete and current data is imposed by statute and cannot be waived by a Government agent. On the other hand, an advance agreement on a reasonable cut-off date to establish the availability of specific categories of data would not be a waiver of the statute, and, indeed, such agreements are now expressly provided for by ASPR 3–807.5(a)(1)." [74–1 BCA at 50,291–92.]