The SINGER COMPANY, LIBRASCOPE
DIVISION
v.
The UNITED STATES.

No. 257–76.

United States Court of Claims.

May 17, 1978.

D. Joe Smith, Jr., Washington, D. C., for plaintiff; Herbert L. Fenster, Washington, D. C., Atty. of record; William J. Spriggs and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; William L. Walsh, Jr., Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUN-ZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on plaintiff's request, filed October 27, 1977, for review by the court of the recommended decision of Trial Judge Robert J. Yock, filed September 7, 1977, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the recommended decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover and, accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

* The trial judge's recommended decision and conclusion of law are submitted pursuant to Rule 166(c). The necessary facts are stated in the opinion.

1. *Singer-General Precision, Inc., Librascope Division*, ASBCA No. 17604, 75–2 BCA ¶ 11,401, *aff'd on reconsideration*, 76–1 BCA ¶ 11,819.

2. "SECTION Y—PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (NOV. 1967)
   "(a) If any price, including profit or fee, negotiated in connection with this contract or any cost reimbursable under this contract was increased by any significant sums because the Contractor, or any subcontractor pursuant to the clause of this contract entitled 'Subcontractor Cost or Pricing Data' or 'Subcontractor Cost or Pricing Data—Price Adjustments' or any subcontract clause therein required, furnished incomplete or inaccurate cost or pricing data or data not current as certified in the Contractor's Certificate of Current Cost or Pricing Data, then such price or cost shall be reduced accordingly and the contract shall be modified in writing as may be necessary to reflect such reduction.
   "(b) Failure to agree on a reduction shall be a dispute concerning a question of fact within

## OPINION OF TRIAL JUDGE *

### YOCK, Trial Judge:

This contract action involves an appeal from a decision of the Armed Services Board of Contract Appeals (the Board).[1] The Board found that the plaintiff's submission of defective cost or pricing data to the Government resulted in an inflated negotiated contract price due to overstated costs. The data found to be defective involved noncurrent labor hours necessary to manufacture the products required under the contract. On cross-motions for summary judgment, the parties seek review of the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

At issue is whether the Board's decision that the Government is entitled to a price reduction of $227,755 pursuant to the "Price Reduction for Defective Cost or Pricing Data" clause [2] of the contract mandated by the Truth in Negotiations Act, 10 U.S.C. § 2306(f) (1970),[3] is supported by substantial evidence and is correct as a matter of law.

For the reasons outlined herein, the Board's decision is affirmed.

the meaning of the 'Disputes' clause of this contract."

3. "(f) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current—
   "(1) Prior to the award of any negotiated prime contract under this title where the price is expected to exceed $100,000;

   *    *    *    *    *    *

   "Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or noncurrent *    *    * ."

*Factual Background*

On August 18, 1967, the U. S. Naval Ordnance Systems Command (hereafter NAVORD) issued a request for proposals for certain fire control equipment needed by the Navy in conjunction with its weapon systems aboard nuclear submarines. In response to this RFP, plaintiff responded with its proposal AX–1001–BF–R1 (hereafter BF proposal) dated October 27, 1967. This proposal, offered to supply six MK 113 fire control systems and one MK 50 Mod 3 attack control console for a fixed price of $6,911,085. The proposal was submitted to Mr. Thomas Kelly, the Procurement Contracting Officer (PCO) and Government negotiator in Washington, D.C. Copies of the proposal with backup documentation were also furnished to the Defense Contract Administration Service (DCAS) and the Defense Contract Audit Agency (DCAA) in California for their use in reviewing the proposal to assist Mr. Kelly. Included with the cost and pricing data submitted October 27, 1967, with proposal BF was a Direct Labor Factors (DLF) report dated October 11, 1967, and computed from data collected through August 1967.

At the direction of Mr. Kelly, this proposal was analyzed by DCAS and DCAA who had resident personnel in plaintiff's plant in the Los Angeles, California area. The auditor's report was dated December 22, 1967, and questioned several cost elements, mainly, however, material costs. The price analyst report was prepared by Mr. Shorchi Maedonochi and dated January 11, 1968. In it he analyzed not only the costs questioned by the auditor's report, *i. e.* materials, but also certain labor hours, specifically setup (preparation) labor hours. He reviewed but did not question the manufacturing labor hours (run hours) represented in the BF proposal by the October 11, 1967, DLF sheet. Mr. Maedonochi issued a supplementary report dated February 27, 1968, which again dealt with material costs.

Mr. Kelly reviewed all of the reports submitted, conversed with the contractor and the DCAA and DCAS personnel when necessary, reviewed past plaintiff contract history and otherwise prepared himself to negotiate the contract. Negotiations took place in Washington, D.C. on April 23 and 24, 1968. A compromise was reached in negotiations with plaintiff on the setup time hours and material costs questioned by the reports and an agreement on price was reached on April 24, 1968, subject to adjustment for revised labor rates. The revised labor rates were at that same time being negotiated in California between plaintiff and the Government by Mr. Gerald R. Devaney, the Administrative Contracting Officer (ACO) assigned by DCAS. Rates were agreed to on or about May 3, 1968, and were to be applicable to all contracts signed between plaintiff and the Government thereafter for approximately 6 months. These revised labor rates were communicated to Mr. Kelly in Washington by the plaintiff shortly after May 3, 1968, and confirmed in writing by Mr. Devaney by letter dated May 8, 1968. The plaintiff then updated its BF proposal to reflect the revised labor rates then going into effect by his submission to Mr. Kelly of May 8, 1968, thereby raising the negotiated price by $600,000.

The negotiations were thus completed. On May 8, 1968, M. Center, vice president and general manager of plaintiff, executed the Certificate of Current Cost or Pricing Data required by the Truth in Negotiations Act certifying that, as of that date, the cost or pricing data submitted to the contracting officer or his representative in support of the BF proposal was "accurate, complete, and current." The contract, N00017–68–C–1220 (hereafter 1220), negotiated pursuant to the authority of 10 U.S.C. § 2304(a)(14) was thereafter prepared by the Government, signed by the plaintiff (M. Center) on July 19, 1968, and formally executed by the Government on August 13, 1968, for a fixed price of $6,743,188.

In mid-August 1968, Mr. Michael Faron commenced the postaward audit of proposal BF (contract 1220), consistent with DCAA's policy of auditing all negotiated contracts in excess of $5 million. After the preliminary report notifying NAVORD, Wash-

ington, of possible defective pricing in the 1220 contract, DCAA issued its audit report No. 452–16–0–0121 on October 3, 1969, which concluded that there had in fact been defective pricing. After appropriate levels of Government review and opportunity for plaintiff to comment, the Government (contracting officer) issued its final decision letter on June 16, 1972, requesting payment in the amount of $227,755. The plaintiff timely appealed the decision to the Secretary of the Navy. The issues were heard and decided by the Board, and that decision, affirmed on reconsideration, was timely appealed to this court.

### Direct Labor Factors (DLF's)

The work to be performed on the 1220 contract involved plaintiff's circuit board fabrication shop, assembly shop, and machine shop. Plaintiff therefore attached to its BF proposal cost data which included estimates of the labor hours necessary in each of the three shops to manufacture the weapons system based on its past experience. As part of this data to support proposed manufacturing labor hours, plaintiff attached a Direct Labor Factor (DLF) report dated October 11, 1967, and specifically identified to the BF proposal.

Plaintiff had utilized an estimating labor hour system involving the DLF report since January 1967. The DLF was prepared monthly from 2 to 3 weeks after the close of the month unless data inputs were delayed, as occurred in several months in 1967 and in January, February and April of 1968. If delays occurred, the data would be incorporated into the next month's DLF.

DLF's as utilized by plaintiff included several informational items, the most relevant of which was the "combined performance factors." These combined performance factors reflected a comparison between the actual labor hours necessary to perform specific tasks in the machine shop, assembly shop and circuit board fabrication shop, and previously established standard labor hours for the same tasks. The actual hours were compiled weekly for the three shops from a computer printout called the "C007 Report." These actual hours would be adjusted by performance factors derived from the average of the most recent 26-week period. The adjusted hours would then be further modified to account for three additional labor support factors "supervision and leadmen," "scrap and rework" and "overage," which were computed from other available monthly reports.

Plaintiff utilized the DLF process as a means for adjusting standard manufacturing time with weighted experience factors to come up with more accurate estimates of labor hours. In short, the monthly DLF was used by plaintiff for estimating a particular procurement by multiplying the combined performance and support factors against the standard times established for manufacturing the items of a particular procurement.

Plaintiff's standard practice from January 1967, through the relevant time period in 1968, was to attach the latest monthly DLF sheet to all its contract proposals. The Librascope Division of plaintiff did approximately 90 percent of its business with the Government, more specifically the Navy, and averaged 30 to 40 proposal submissions per month. During the period of time in question, plaintiff did not have a practice of updating proposals with later dated monthly DLF reports, regardless of the time interval between proposal submission and contract negotiation or execution. Although plaintiff had over the years produced similar items for the Government (since the 1940's in volume), this BF proposal was the first significant proposal over $5 million which had utilized DLF's in the estimating process.

### Government Representatives

#### Mr. Faron

In August 1967, Mr. Michael Faron was assigned by DCAA to plaintiff's plant in Glendale, California to be a resident auditor. Mr. Faron had been a Government auditor for approximately 1 year at this point. Shortly thereafter (October) he was given the responsibility of making a survey

of plaintiff's estimating systems. The assignment was to serve the dual role of acquainting Faron with the estimating systems utilized by the plaintiff in proposal submissions as well as accumulating general estimating systems information for use in later DCAA plaintiff audits. The survey project had no direct or indirect relationship to any specific price proposal reviews being conducted by other resident DCAA auditors at that time. The survey was concerned with all plaintiff estimating systems including material as well as labor costs systems.

In surveying the manufacturing labor hour costs here at issue, Faron conferred with Mr. William Girouard, plaintiff's Director of Industrial Engineering. Girouard provided several reports for Faron's use, one of which was a DLF. Faron found the data (including the DLF) to be of value in verifying factor sheets and underlying support data, and asked to be put on plaintiff's regular distribution list. Girouard granted the request and starting in November 1967, made routine distribution to Faron of the data, including monthly DLF's. As a part of this routine distribution, Faron received a DLF dated March 18, 1968. Neither the March 18, 1968 DLF nor any other DLF's provided Faron for the survey referenced the BF proposal.

Faron's Estimating Systems Survey was dated March 29, 1968. During this period of time (October 1967—March 1968) Faron's major task was the Estimating Systems Survey. He did not do original audit work on any specific plaintiff proposal. In late January 1968, Faron was elevated from resident auditor status to auditor in charge at the plaintiff's plant, and in that capacity became involved in various administrative duties including reviewing various audits, none, however, again involving proposal BF.

In working on the Estimating Systems Survey, Faron at no time related any of the DLF's to proposal BF nor did he perform any preaward audit on the manufacturing labor hour estimate of proposal BF. It is clear, however, that Faron by March 29, 1968, understood how plaintiff constructed the DLF's and their use in its estimating proposals. It also is clear that Faron detected a downward trend in the DLF's based on plotting the DLF's and other data that had been furnished him. At this point in time, however, Faron had no knowledge of plaintiff's practice of not updating DLF's.

Faron continued to pursue the DLF downward trend detection by assigning a DLF plotting curve project to one of his resident auditor associates and by assigning himself two specific proposal/contract audits in which DLF's were utilized. The DLF plotting projects was assigned in late April 1968, files opened on April 29, 1968, and the work analysis performed in May and early June 1968. These plots confirmed the continued downtrends in DLF's. Faron started his specific proposal audits in mid-April 1968. The spare parts proposal audit (contract No. 1214) was issued and dated May 9, 1968. The multi-year contract audit (contract No. 1218) was issued and dated on May 23, 1968. The results of the audits indicated that plaintiff had not updated DLF's in either of the proposals. These two audit reports were the first specific proposal/contract audits that Faron worked on and in which the question of updating DLF's between proposal submission time and price negotiations time was first raised. After these two audits were completed and in reviewing subsequent proposals prior to August, it became clear to Faron that the plaintiff was not updating the DLF's.

In mid-August 1968, Faron commenced the postaward audit of contract 1220. The audit report, 452–16–0–0121, was formally issued on October 3, 1969. In this report, Faron determined that by not updating the manufacturing labor hour data (DLF's, C007 weekly printouts, and other contractor generated data) through April 29, 1968, plaintiff had overstated its current manufacturing labor hour experience by 20,646 manufacturing hours. With overhead and profit, these hours computed out to $227,-755. Faron indicated that he chose the April 29, 1968, date for his calculations because it was the period of time immediate

to the plaintiff's execution of the Certificate of Current Cost or Pricing Data on May 8, 1968. He indicated further that he had utilized the March 18, 1968, DLF sheet for the support factors and superimposed other contractor generated data (performance and support data) which was more currently available than showed on the March 18, 1968, DLF sheet. Faron concluded that this was defective pricing because the plaintiff, when it executed the Certificate of Current Cost or Pricing Data on May 8, 1968, did not make the Government aware of the "accurate, complete, and current" manufacturing labor hour data available to it.

### Mr. Devaney

Mr. Gerald Devaney was the Administrative Contracting Officer (ACO) on this contract. He has been employed by the DCAS branch office in Pasadena, California since December 5, 1965. Between 1965–1969, Devaney was responsible for reviewing plaintiff's proposals/contracts along with the proposals/contracts of approximately 40 other Government contractors in the area. His function was to administer contracts, negotiate and process modifications, and to review proposals. He received proposals from plaintiff at the rate of 30–40 per month. Altogether he reviewed approximately 50 proposals per month.

Mr. Devaney was not directly involved in the negotiations of the BF proposal (1220 contract) as these matters were being handled by Mr. Kelly in Washington, D. C. His function in this case was to gather information (audits, pricing analysis reports, etc.) requested by Mr. Kelly, generally review the same for completeness and forward the information to Mr. Kelly. He followed this practice with regard to the audit report (December 22, 1967) and price analyst reports involved (January 11, 1968 and February 27, 1968), along with other miscellaneous information.

Mr. Devaney testified that he received DLF's from plaintiff (after January 1967) on all proposals submitted to him during the period. Although he and his staff would review the DLF's to determine whether they were reasonable to support the labor hours proposed, it never occurred to him to look for a long-range pattern (trends) by comparing one DLF submitted on one proposal with a later DLF submitted with another. He justified this lack of comparison by citing his office's inundation with work. He indicated that he became aware of the DLF's downtrend significance to plaintiff's proposals only through the efforts of Mr. Faron. He stated categorically that there was no agreement, tacit or otherwise, that would allow plaintiff not to update, and indicated he was unaware of it not being done. His recollection was that the BF proposal (contract 1220) was the first major procurement (over $5 million) to utilize the DLF's. He observed that under the system then in place, the price analyst (and not the auditor) would be the person to review and analyze the DLF's. Labor hour analysis was their area of responsibility. He indicated that he received no updated DLF's after submission of proposal BF on October 27, 1967, which was specifically identified to the proposal. He finally testified that if updated DLF's or other material had been given to him and identified to proposal BF, he would have notified Mr. Kelly in Washington of the information and done the necessary analysis in support of Mr. Kelly.

### Mr. Maedonochi

Mr. Shorchi Maedonochi, employed by the DCAS, Pasadena, California office, was the price analyst assigned to plaintiff's BF proposal. He authored the primary January 11, 1968, report as well as preliminary and supplementary reports and memos. It was his responsibility to analyze the plaintiff's labor hours proposed in the various proposals he analyzed.

In the January 11, 1968, report, Maedonochi questioned the setup labor hours proposed by the contractor, as well as several material costs. Maedonochi did not question the proposed manufacturing labor hours as they seemed reasonably related to the standard labor hours assigned. The

DLF he analyzed in this connection was dated October 11, 1967, and attached to the BF proposal. Although he acknowledged receiving later dated DLF's in connection with other proposals he was assigned to review during the time frame (December 1967—February 1968), he did not utilize them in his analysis. He indicated that his supplementary report dated February 27, 1968, dealing with the questioned materials was his last contact with the BF proposal. He received no cost data specifically identified to the BF proposal between February 27 through May 8, 1968. He testified that had he received such data, he would have notified Mr. Kelly and/or Mr. Devaney. Furthermore, he testified that in the normal course of events once the price analysis was complete, later data would be forwarded by the contractor to the negotiator on the proposal and not the price analyst. He did continue to receive other proposals for review during this period that included plaintiff's later dated DLF's. He further testified that he was unaware of Mr. Kelly's negotiating schedule in Washington as it related to this proposal.

Mr. Maedonochi emphatically testified that there was no agreement, written or otherwise, regarding updating of DLF's. He did acknowledge that he was aware from reviewing plaintiff's proposals from January 1967 through February 1968, that plaintiff did not update the DLF's. He also acknowledged that when he was asked to be the negotiator on certain small proposals that he would use all current information available to him as a hedge, and that both the contractor and the Government did this.

### Mr. Kelly

Mr. Thomas Kelly was the Government negotiator (Procurement Contracting Officer) on the 1220 contract. He was employed by NAVORD as a senior negotiator in Washington, D. C. and from January 1967 through April 1969, dealt exclusively with all Librascope contract actions. He handled the negotiation sessions by himself, and he delegated no authority to field personnel (DCAA or DCAS) in connection with the negotiation of this contract.

The plaintiff submitted proposal BF dated October 27, 1967, to Mr. Kelly in Washington. Shortly after receipt, Kelly requested the usual support reports from DCAA and DCAS. He received the audit report dated December 22, 1967 on January 8, 1968, which report questioned mainly various material costs in plaintiff's proposal. Kelly received the price analyst's report dated January 11, 1968 in the latter part of January 1968. This report analyzed the material costs questioned by the auditor and also analyzed the labor hour costs. The only labor costs questioned were setup labor hour costs. There was no question raised as to the manufacturing labor hour costs proposed. Kelly used the reports to prepare himself for the negotiating sessions, concentrating on those material and labor costs questioned. In addition, he researched past plaintiff contract history. He relied heavily on the reports submitted to him. After the reports were received, Kelly indicated he had numerous discussions with both the audit and DCAS (price analyst) people in California and the plaintiff's people between January 1968 and May 8, 1968 on this proposal as well as on all other matters then going on.

Sometime after February 26, 1968, the plaintiff submitted new written information correcting some mathematical errors in the proposal to him in Washington. Face-to-face negotiations took place in Washington on April 23 and 24, 1968. Plaintiff at that time submitted to Kelly numerous updated and backup documents, primarily relating to material costs questioned. As to labor hours, Kelly testified that the parties negotiated only on the setup (preparation) hours questioned. The price analyst recommended a 5.2 percent reduction. Mr. Kelly attempted to negotiate a 5 percent reduction figure but settled for a 3 percent reduction figure. There were no negotiations or new data submitted (DLF's) at the negotiating sessions with regard to the manufacturing labor hours. At the close of the sessions, the parties had agreed to price, subject to new labor rates to be applied to the labor hours.

The labor rates were confirmed on or about May 3, 1968, and Kelly thereafter requested the necessary Certificate of Current Cost or Pricing Data from the plaintiff. Plaintiff executed the certificate on May 8, 1968, and delivered the same to Kelly together with new labor rates on May 9, 1968. Kelly testified that he never received, prior to May 8, 1968, any updated DLF's or other data from either the plaintiff or any of the Government representatives involved with this contract. Kelly indicated he never raised the updated DLF question with plaintiff because he had no information on which to alert him to raise it prior to May 8, 1968. Sometime in June 1968, he first became aware of the updating DLF problem through a report dated May 23, 1968, relating to another contract (1218). In that report, DLF downtrends were noted having a significant effect on manufacturing labor hours.

Kelly testified that he relied on the information submitted to him in the October 27, 1967, proposal pertaining to manufacturing labor hours in coming to a price agreement. Had plaintiff disclosed the current DLF's and supporting data indicating a downtrend to him prior to May 8, 1968, there would have been a reduction of $227,755 in the contract price negotiated, that is, it would have reduced the manufacturing labor hours by 20,646.

### Discussion

The ultimate question to be resolved in this case is whether plaintiff adequately disclosed to the Government the "accurate, complete, and current" labor costs necessary for plaintiff to produce the products called for under the contract. In addition, even if there was not adequate disclosure of relevant costs, it must be determined whether the Government relied on the overstated costs to its detriment. Finally, if the above two points are decided in the Government's favor, it still must be determined whether the recovered sum is appropriate under the factual circumstances. As indicated, the Government prevails on all three points.

### I.

The plaintiff in its first major contention argues, that by furnishing later dated DLF's by general distribution within the plaintiff's plant and in connection with every later proposal submitted by plaintiff to several Government employees associated with the contract in question, this fulfills the affirmative duty of disclosure called for by the Truth in Negotiations Act. The subpoints in this argument are that a contractor may disclose the appropriate information to any Government official having a substantial part in the proposal/contract negotiations including analysis and review. Also, that the significance of the DLF's (downtrend) was recognized and known or should have been known to the Government personnel involved. Further, that actual knowledge of the significance of the DLF's is a defense to defective pricing actions and that defendant deliberately chose not to utilize the actual knowledge in its negotiations.

The Government does not seriously dispute the plaintiff's first subpoint. It does argue, however, that if plaintiff chooses to disclose information to a Government official connected with the contract other than the negotiator, it then has a "higher burden of identification," so that the information will find its way to the negotiator. In my view, the plaintiff's duty to disclose remains the same whether he chooses to disclose to the negotiator or to some other appropriate Government employee. What the plaintiff must do is physically deliver the information to the Government and make the information's significance to the negotiation process known. *M-R-S Manufacturing Co. v. United States,* 492 F.2d 835, 203 Ct.Cl. 551 (1974). Under the facts of this case, it is concluded that the plaintiff could have accomplished appropriate disclosure by disclosing to any one of the four Government employees involved.

The plaintiff's next subpoint goes to the question of whether plaintiff did in fact accomplish appropriate disclosure to any one of the four Government employees in-

volved. Plaintiff contends that by delivering later dated DLF's to the three Government employees located in plaintiff's plant in California, they became aware or should have become aware of the significance of the downtrend in DLF's and therefore it was unnecessary to point out this significance to them.

The Government disputes this central point vigorously, relying on the testimony of the four Government employees involved and the Board's findings in this connection.

It is undisputed that no later DLF's were ever delivered to Mr. Kelly, the contracting officer and Government negotiator in Washington, D.C., after submission of the proposal to him on October 27, 1967, and before the May 8, 1968, certificate was executed. This was true even though the plaintiff had numerous telephonic communications with Mr. Kelly during this time frame, and submitted written communications to him prior to the time of negotiations on April 23 and 24, 1968. The plaintiff also submitted numerous written backup materials to him at the time of negotiations.

It is also undisputed that plaintiff did not deliver any later dated DLF's specifically identified to the BF proposal after submission on October 27, 1967, and before May 8, 1968, to the three Government employees in California. Plaintiff did deliver later dated DLF's to the three employees, either in connection with other proposals pending or as a part of a general distribution program.

The plaintiff argues with regard to Mr. Faron, that he became aware of the significance of the DLF's through his Estimating Systems Survey which was issued on March 29, 1968 and his two proposal reviews (contracts 1214 and 1218) issued on May 9, 1968 and May 23, 1968.

It is quite true that Faron became generally aware of the downtrend in the DLF's and generally aware how plaintiff used them. He did not, however, become aware that plaintiff had a practice of not updating DLF's at least not until the two May audit reports were complete, which was after the May 8 certification date. One audit report

does not indicate a practice—maybe two do. Although even that requires considerable straining to agree with. Unless Faron was aware of the plaintiff's practice of not updating, what difference does it make that he had the general knowledge of a downtrend? If plaintiff updated his proposals with new DLF's, then no harm to the Government would result. Sometime after completion of the second May 23, 1968 (multi-year 1218 contract) and before the commencement of the 1220 postaward audit in mid-August 1968, Mr. Faron acquired knowledge of the plaintiff's nonupdating practice. However, by this time it is too late for plaintiff to argue either its actual or its constructive knowledge theory in regard to Mr. Faron.

In addition, the language of *M-R-S Manufacturing Co. v. United States, supra,* 492 F.2d at 842, 203 Ct.Cl. at 564, is enlightening:

Situations wherein accurate, complete, and current information is known to the contractor and not known to the Government can certainly be avoided if such information is physically delivered to the Government and the information's significance to the negotiation process is made known to the Government by the contractor.

Plaintiff does not contend that it made Mr. Faron aware of the information's significance to the negotiation process, *i. e.,* identified the material to the BF proposal. Plaintiff does contend that this was unnecessary, since Mr. Faron made himself aware of the significance of the materials and it was incumbent upon him to relate the significance to the BF proposal. But that is not what the law quoted above directs. Furthermore, it shifts the affirmative duty of disclosure from the plaintiff to the Government. Faron was not required to relate his generalized downtrend knowledge to the BF proposal. In fact, Mr. Faron indicated he did not even know of the status of negotiations on the BF proposal, *i. e.,* he did not know that negotiations were to take place on April 23 and 24, 1968, in Washington under Mr. Kelly's direction and

that a Certificate of Current Cost or Pricing Data was to be executed shortly thereafter.

■ It is concluded that there was no physical delivery of appropriate, specifically identified DLF's to Mr. Faron. Nor did the plaintiff point out to Mr. Faron the significance of the generally distributed DLF's to the BF proposal which was then in process. In short, there was no effective disclosure of the information to Mr. Faron prior to the critical May 8, 1968, date. The evidence amply supports the Board's conclusion to this effect.

The plaintiff then turned to Mr. Maedonochi, the price analyst, and argued that he became aware of the plaintiff's practice of not updating DLF's through his proposal and modifications reviews from January 1967 through May 8, 1968. The plaintiff contends that at some point in time, Maedonochi was required to utilize this nonupdating information, i. e., take the DLF out of the context it was provided in and apply it to the BF proposal (1220) and either update it himself or advise Mr. Kelly of this information. Maedonochi conceded that he was aware prior to May 8, 1968, that the plaintiff did not update the DLF's.

The problem with the plaintiff's argument is that although Maedonochi had the general knowledge that plaintiff did not update, he did not have the general knowledge that there was a downtrend in the DLF's. Without this downtrend knowledge, this nonupdating knowledge was immaterial also. The downtrend information evolved out of Mr. Faron's Estimating Systems Survey which was issued on March 29, 1968. Even then the downtrend information was not generally known by DCAS until Mr. Faron brought this information to their attention sometime in June/July 1968. Mr. Maedonochi's last effective contact with the BF proposal was on February 27, 1968, when he issued a supplementary price report relating to material costs. From that point forward, Mr. Maedonochi testified he was unaware of the status of the BF proposal negotiations in Washington, D. C.

Finally, the plaintiff argues that Mr. Devaney, the ACO who received 30 to 40 proposals from plaintiff each month with updated DLF's attached thereto, was aware or should have been aware of plaintiff's nonupdating practice, and the significance of it and therefore should have communicated this significance to Mr. Kelly. Like Mr. Maedonochi, he was unaware of the downtrend in DLF's and only became aware of this information approximately 1 to 2 months after the critical May 8, 1968, date. Unlike Mr. Maedonochi, however, Mr. Devaney, in view of his role as Administrative Contracting Officer, was in close communication with Mr. Kelly in Washington, D. C. regarding the status of this proposal and all others. However, he never did on his own initiative relate one DLF to another due to the press of time, nor did the plaintiff communicate this connection to him. Consequently, there simply was not any information that Devaney had generated by himself or that he had been advised of by the plaintiff, that he had to either take direct action himself on or relate to Mr. Kelly. Mr. Devaney's role in this case comes close to the factual situation in *Sylvania Electric Products, Inc. v. United States*, 479 F.2d 1342, 1348, 202 Ct.Cl. 16, 25, 26 (1973), where the court held disclosure of "some" information to the ACO was insufficient for the purposes of the Act.

With regard to both Mr. Maedonochi and Mr. Devaney, the facts clearly indicate that they received later dated DLF's in connection with other proposals, and they also received generally distributed DLF's when published by the plaintiff. They, however, never received any later dated DLF specifically related to the BF proposal, nor did the plaintiff ever disclose the significance of any later dated DLF to the BF proposal negotiations, then in progress, to these two men.

■ In every case, the DLF's were supplied to the two men in another context, for another purpose unconnected with the BF proposal negotiations, without an explanatory word from the plaintiff. I therefore agree with the defendant's contention that

mere submission of DLF's to these gentlemen in this context was not enough to constitute disclosure on the facts of this case. In light of their relative isolation from the contract negotiations and preoccupation with other tasks, plaintiff could not reasonably expect these gentlemen to independently identify and transmit the pricing data to Mr. Kelly. The affirmative duty to disclose the appropriate information remained with the plaintiff.

█ In his final subpoint, plaintiff argues that the Government had actual knowledge of the significance of the data, and it chose not to use the data in its negotiations with plaintiff. The discussion and conclusions above doom plaintiff's argument here. None of the four Government employees here involved had the necessary actual knowledge of the significance of the DLF's to the BF proposal at the time it was critical to have that knowledge, i. e., on or before May 8, 1968.

Obviously without the requisite actual knowledge, one cannot make an effective election or choice, hence the plaintiff's argument fails at the threshold.

## II.

In plaintiff's second major contention, it is argued that the Government is estopped from denying that the DLF's were accurate, complete and current because of the Government's alleged participation in the plaintiff's nonupdating practice. To begin with, it is agreed that this court has approved the application of the estoppel doctrine to Government contract cases under appropriate factual circumstances. *Russell Corp. v. United States*, 537 F.2d 474, 210 Ct.Cl. 596 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 202 Ct.Cl. 1006 (1973); *Manloading & Management Associates, Inc. v. United States*, 461 F.2d 1299, 198 Ct.Cl. 628 (1972). What is not agreed with, however, is the application of the estoppel doctrine to the facts of this case.

Plaintiff alleges that the defendant's participation in plaintiff's nonupdating practice induced it to continue its practice of nonupdating to its detriment. Plaintiff's argument presupposes defendant's participation is based on knowledge and/or an agreement. But the facts do not support a finding that there was an agreement. All of the four Government employees testified to the contrary. In addition, as the discussion of plaintiff's first major contention indicates, there was never any appreciation of the significance of the plaintiff's nonupdating practice to the BF proposal. None of the four Government employees involved had both elements of the requisite knowledge necessary (plaintiff's nonupdating practice and DLF downtrend) at the time it was critical to have it. This is the knowledge that is necessary if the plaintiff is to succeed on an estoppel theory.

█ Even if plaintiff could get by the threshold knowledge element of an estoppel theory, it would run headlong into the other three elements. Defendant must be held to intend that its conduct shall be acted on, or it must so act that the party asserting the estoppel has a right to believe it so intended. Here the facts belie the requisite intention on the part of the Government. Furthermore, this court has made it very clear that even if the Government would want or intend to waive a statutory requirement, it would not have the necessary authority to do so. *M-R-S, supra* 492 F.2d at 841, 203 Ct.Cl. at 562. Then the plaintiff would have to also show that it was ignorant of the true facts. One of the true facts that plaintiff would have to be ignorant of is the downtrend of the DLF's which its own records revealed.

Finally, plaintiff would have to show that it relied on the Government's conduct to its detriment. But where is the detriment? Plaintiff did have to give back the $227,755. But that only placed it back into the position it should have been in to start with anyway. Had plaintiff disclosed as required by law, it would never have received the $227,755.

■ The Board found that the facts simply did not support the plaintiff's estoppel argument.[4] I agree.

### III.

The plaintiff's third major contention is that due to the cyclical nature of the DLF data, any given DLF was inherently as accurate as any other one. This contention is based apparently on an average-out theory. Since 90 percent of plaintiff's business was placed with the Government, the fact that the DLF's showed a downtrend in relation to the time span of one proposal which may pecuniarily benefit the plaintiff, would be balanced off on other proposals where the trend in DLF's was up, thereby benefiting the Government. Neither the Government nor the plaintiff loses out in the long haul.

■ The problem with the plaintiff's theory is that it does not conform to the law. The Act contemplates that each and every negotiated contract and modification over $100,000 would be accompanied by a certificate from the contractor specifying that the cost and pricing data was accurate, complete and current up to the time of price agreement. The plaintiff's duty is to disclose all data which might affect the contract price. *Cutler-Hammer, Inc. v. United States*, 416 F.2d 1306, 189 Ct.Cl. 76 (1969). Plaintiff can argue about the relevance and cyclical nature of the disclosed information later. But it has an obligation to disclose it. It cannot unilaterally decide what can be disclosed and what cannot. The duty imposed by the law is for the plaintiff to disclose.

Furthermore, plaintiff's theory is not supported by the facts. Mr. Kelly testified (as did Mr. Faron) that if the plaintiff had disclosed the downtrend significance to him at the time of the negotiations, the result would have been a price agreement reduced by $227,755. This does show the causal relationship that plaintiff says is an essen-

tial element for defendant to prove its case. *Sylvania Electric Products, supra*, 479 F.2d at 1349, 202 Ct.Cl. at 27–28. It also shows that there was a wide variation in cost and pricing information on the DLF submitted with the proposal in October of 1967 and the cost and price data available in April 1968.

The Board found that plaintiff's theory in this connection lacked merit. It is determined that there are substantial facts in the record to support this conclusion.

### IV.

The plaintiff next contends that the defendant's approval in early 1970 of a nonupdating system was an admission against interest which bars defendant from taking an inconsistent position in this litigation. Plaintiff cited the case of *Carey v. United States*, 326 F.2d 975, 164 Ct.Cl. 304 (1964).

The *Carey* case is not found to be controlling. In that case, the court held that prior acknowledgment in litigation by the defendant to the effect that plaintiff was the owner of a patent precluded the defendant from later denying that ownership. In this case, plaintiff is asserting that a forward pricing agreement entered into between the plaintiff and the defendant almost a year and a half after this contractual controversy arose, is inconsistent with the defendant's theory of this litigation, tends to disprove the Government's defective pricing theory, and consequently bars recovery. This court recently had an opportunity to analyze a like argument in *Sea-Land Service, Inc. v. United States*, 553 F.2d 651, 213 Ct.Cl. 555 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978), and found it lacking. It was held that only actions and interpretations which occur before a controversy arises are relevant in determining and interpreting the meaning of a contract. In this case all the important actions or events occurred well before the bilateral agreement was signed in early 1970.

---

4. The Board on reconsideration also considered and rejected plaintiff's closely related entrapment argument. Although it is not entirely clear, plaintiff appears to have abandoned this claim before this court. It is concluded that plaintiff did so for good factual and legal reasons. ·

■ The Board in rejecting the plaintiff's argument differentiated between a bilateral agreement under authority of relevant regulations for forward pricing agreements and a unilateral determination by a contractor to provide the data it considers as accurate as later and more current data. It is concluded that there was substantial evidence to support the Board's conclusion and that it is correct as a matter of law.

## V.

Plaintiff's fifth major contention is that the Government had failed to sustain its burden of proof.

■ There is no question that the Government has the burden of proof for all elements of defective pricing cases. *Sylvania Electric Products, supra*, 479 F.2d at 1349, 202 Ct.Cl. at 28.

The plaintiff contends that the Government has failed to prove that there was not effective disclosure by plaintiff generally distributing its DLF's every month and by its placing later dated DLF's in every proposal package. It also contends that the Government failed to prove that the Government employees involved did not have actual knowledge of the significance of the DLF's to the BF proposal. Finally, it contends that the Government failed to produce the auditor that authored the December 22, 1967, audit report on the BF proposal, and whose testimony plaintiff deems essential in order for the defendant to sustain its burden of proof.

All of the above, save the auditor argument have been addressed at length herein, found against the plaintiff, and therefore will not be addressed again at this point. The auditor production argument, however, does require some discussion.

■ To begin with, testimony adduced at the Board hearing indicates clearly that the responsibility for analysis of the manufacturing labor hours contained in proposal BF rested not with the auditor, but with the price analyst. In other words, it was clearly Mr. Maedonochi's responsibility to analyze the subject matter of this controversy. The Government did produce him as a witness and he testified on direct and cross-examination as to the analysis and reports he made. Secondly, the December 22, 1967, audit report that was authored by Mr. Charlie Mock, the auditor involved, was made a part of the Board's record. Review of the report indicates that he analyzed mainly various bills of material costs and did not discuss manufacturing labor hour costs. The auditor's report was in fact quite irrelevant to this entire controversy. Thirdly, Mr. Faron, the auditor in charge, who became Mr. Mock's supervisor within a month of the report's date, did testify at length about the entire matter, and the rather minimal role that the auditors played in this case. Finally, on the basis of the facts involved, one simply cannot reasonably conclude that the plaintiff gave to Mr. Mock any more information than it gave to the other four gentlemen involved. And the plaintiff, of course, does not contend that it did. Its only contention is that the auditor had the same information that the other four Government employees had, which amounts to sufficient disclosure under the Act. It is concluded, therefore, that the auditor's testimony was unnecessary to sustain the defendant's burden of proof. At best it would be repetitious, at worst irrelevant.

■ As to the element of reliance, one need not dwell very long. The Board found NAVORD did rely on the plaintiff's noncurrent DLF data in negotiating the 1220 contract. Mr. Kelly testified that if the current information would have been before him at the time of price negotiations, the contract price would have been reduced by $227,755. Mr. Devaney testified that had he received the current information, he would have run it through for analysis. This testimony establishes the logical nexus between the nondisclosed data and the possibility of a significantly lower negotiated contract price which this court has found entitles the Government to a reduction in the contract price. *Sylvania Electric Products, supra*, 479 F.2d at 1349, 202 Ct.Cl. at 27–28.

It is concluded from the above discussion that the Government has proven the necessary elements of its case.

## VI.

Finally, an analysis must be made of the plaintiff's alternative argument. Plaintiff maintains that even if this court finds that the nonupdating of proposal BF constituted defective pricing, the correct measure of recovery is $23,417 rather than $227,755. This contention is based on the theory that the last regularly published DLF data sheet prior to the execution of the certification on May 8, 1968, was the March 18, 1968, one. Consequently, this DLF represented the last practically available cost and pricing data available to either the plaintiff or the defendant.

Plaintiff's contention in this regard does have some superficial appeal. After all, this case is concededly not one of conscious or deliberate withholding of information on the part of the contractor. Nevertheless, the law has to be applied to the facts.

The facts before this court indicate that the last regularly published DLF sheet prior to May 8, 1968, was the March 18 one. The facts also indicate that the plaintiff did not effectively disclose the March 18 DLF sheet to the Government. The Board so found and the evidence amply supports that conclusion. The facts also disclose that there was later generated contractor data, weekly and monthly reports, which updated portions of the data even closer to the critical May 8, 1968, date. Mr. Faron has testified that he used the information then available to the plaintiff to construct a hypothetical DLF sheet as of April 29, 1968, 10 days prior to May 8, 1968. It is then incumbent upon this court to determine whether this procedure was appropriate under our facts and consistent with the dictates of the law.

▆▆ The Board found the procedure to be appropriate on these facts, and consistent with the law. I agree. It is concluded that the Act speaks to disclosure of current data, if practically available wherever it may be found. The Government should not have to wait for, nor rely on, a regularly published report.

In *Lockheed Aircraft Corp. v. United States*, 432 F.2d 801, 193 Ct.Cl. 86 (1970), this court held that plaintiff owed a duty to disclose the significance of data contained in a Kardex file and failing that, should have come up with a bill of materials in a short period of time. Also in *Sylvania Electric Products, supra*, 479 F.2d at 1347, 202 Ct.Cl. at 23–24, the court found plaintiff's argument that its intra-corporate communications difficulties made information in one division not reasonably available to another, to be untenable even ludicrous. In this court's latest interpretation of the Act, *Conrac Corp. v. United States*, 558 F.2d 994, 998, 214 Ct.Cl. 561, 569 (1977), it stated:

> * * * The rule in *Lockheed* is that the best price data must be furnished, not that data in less than prime form, because of time or other constraints, may handily be hidden from the Government. *Lockheed* thus cannot be relied on in his case to relieve the contractor from a duty to disclose the information on its purchase history cards simply because there was insufficient time to assemble that information in BOM form.

One of plaintiff's employees, Mr. Girouard, who was responsible for publishing the DLF report, testified that if pressed he could come up with a new DLF sheet practically instantaneously. Also, in response to a question as to why the April 1968 DLF was not published, he indicated that the calculations which were to be accomplished by another plaintiff employee from a monthly report simply were not done due to the press of time. The data was available for the calculations, but the calculations were not completed in time. Finally, Mr. Girouard testified that he had all the available inputs needed by May 2, 1968, to bring out the May 1968, DLF, which he in fact did on May 20, 1968. From this testimony, one can only conclude that the data was practically available to the plaintiff prior to the critical May 8, 1968, date.

At the hearing, Mr. Faron testified at length about why he chose the April 29, 1968, date as the cutoff date, and about how he calculated the defective pricing overcharge. As to the date, the sum of the testimony was that at this point, the plaintiff had all the necessary monthly and weekly reports available to it, and within the 10 days remaining to May 8, 1968, could have easily disclosed this information or brought out a new DLF for this contract. As to the calculations, the plaintiff did not raise any objections to this line of questioning, nor by cross-examination was it able to point out any errors or flaws in the calculations. In fact, in response to the board member's question, the plaintiff's attorney acknowledged that the rates used by Faron in the calculations were correct and not at issue. Even at this point, the plaintiff does not argue that Faron's calculations (adopted by the contracting officer in his final decision letter dated June 16, 1972) is in error if we find the April 29, 1968, date to be consistent with the law. What plaintiff argues for is that the March 18, 1968, DLF data is the appropriate data to utilize for calculation purposes, consistent with the law.

In view of the discussion above, it is concluded that the April 29, 1968, date was appropriately selected by the Government. Also, the language and rationale used by the court in *Conrac Corp., supra,* 558 F.2d at 999–1000, 214 Ct.Cl. at 572–73, is appropriately applied to the facts in this case. The court stated therein:

> * * * On balance, administrative discretion must be trusted, and administrative expertise relied upon, to determine which overpricing claims should be pursued, and which should be left to lie. Assuming such discretion to be judicially reviewable for abuse, no such abuse has been demonstrated here. The board's standard for requiring a refund in this case, where it found the amount of the component price difference would likely have been the subject of meaningful negotiations, is a sound one, established within its authority, and we decline to disturb the result reached under it. * *

It is determined that the Act and the contract provision allow certain administrative discretion in this connection and that that discretion as exercised was not abused.

Under the circumstances of this case, it is concluded that the Board's decision on this point was supported by the evidence and was not in error as a matter of law.

## CONCLUSION

For the foregoing reasons, the Board's reasoning and its result are sustained. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.